SCRUGGS-VANDERVOORT-BARNEY, INC., A CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7223.   Promulgated September 19, 1946.

*Gustavus A. Buder, Jr., Esq.*, for the petitioner.
*Felix Atwood, Esq.*, for the respondent.

OPINION.

BLACK, *Judge*: The issues presented in this proceeding are: (1) Whether or not the reimbursement to the depositors of the insolvent Scruggs, Vandervoort & Barney Bank under the circumstances detailed in our findings of fact represent ordinary and necessary business expenses within the meaning of section 23 of the Internal Revenue Code; (2) if the claimed deduction of $240,888.31 or any part thereof

is not allowable, whether or not the petitioner overstated its taxable income for the year 1941 by reason of the fictitious gross profits resulting from redemption of the certificates; (3) whether or not the respondent erred in eliminating the amount of excess profits carryover from the fiscal year ended July 31, 1941, to the fiscal year ended July 31, 1942, by the adjustments to its taxable income in 1941, and determining the tax for the fiscal year ended July 31, 1942, on the basis of the income without proper allowance for the said carry-over; and (4) whether or not the respondent erred in reducing equity invested capital for the fiscal year ended July 31, 1942, in the amount of the deficiency asserted for the fiscal year ended July 31, 1941.

*Issue No. 1.*—Petitioner contends that the cost of reimbursement to the depositors of the bank by the issuance of merchandise certificates represents ordinary and necessary business expense within the meaning of section 23 of the Internal Revenue Code [1] and is deductible from income in the years of issuance of the certificates.

In support of its contention petitioner argues that originally its predecessor organized the bank, owned 97.25 per cent of the stock, and gave it a name almost identical to its own (Scruggs, Vandervoort & Barney Bank), and five of its nine directors were also members of a board of directors of petitioner's predecessor. It also argues that the bank was operated within the store, had no separate entrance, was accessible to the public only by the same elevators, escalators, and stairway as were used in patronizing the store; that it was open for business during the store hours and served as a convenience to the store's customers, as well as a means of attracting patronage to the store, and was a valuable adjunct to the store because depositors and borrowers, when transacting bank business, were attracted to the store's merchandise. Petitioner also maintains that the public viewed the bank as part of the store operation, for when the bank failed the petitioner's predecessor "received letters and other communications from dissatisfied customers who had money on deposit in the bank"; that the change in name from Scruggs-Vandervoort-Barney Dry Goods Co. to Scruggs-Vandervoort-Barney, Inc., at the time of reorganization on February 1, 1937, did not give rise to another and new corporation in the eyes of the store's customers or the public; that, as the petitioner became the transferee of the assets of its predecessor, so it also inherited the expectancy on the part of the bank's depositors for it to make good any deficiency in their deposits. Petitioner further

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.
   In computing net income there shall be allowed as deductions :
   (a) EXPENSES.—
   (1) TRADE OR BUSINESS EXPENSES.—
   (A) IN GENERAL.—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *

maintains that, in its desire to avoid unfavorable reaction on the part of the bank's depositors, most, if not all, of whom were petitioner's customers, and to prevent lost patronage and diminished business, it decided to reimburse the depositors for the amount of the deficiency. Petitioner also stresses the fact that its own bankers advised that it make these reimbursements in order to preserve the good will of its own business.

Respondent argues that the issuance of the merchandise purchase certificates under the circumstances herein constituted voluntary gifts and not ordinary and necessary business expenses incurred by petitioner in carrying on its trade or business. He maintains that neither petitioner nor its predecessor had any legal liability to the depositors of the bank; that while petitioner believed, and its bankers agreed, that it would be advantageous for petitioner to make the reimbursements herein, the record does not show that they were necessary or ordinary in the carrying on of its business.

What constitutes an ordinary and necessary expense has been passed upon in many cases. As was said by the Supreme Court in *Welch* v. *Helvering*, 290 U. S. 111:

Many cases in the federal courts deal with phases of the problem presented in the case at bar. To attempt to harmonize them would be a futile task. They involve the appreciation of particular situations, at times with border-line conclusions. * * *

Among the cases cited by petitioner in support of its contention that the expenses in question are deductible are *Edward J. Miller*, 37 B. T. A. 830; *Robert Gaylord, Inc.*, 41 B. T. A. 1119; and *Dunn & McCarthy, Inc.* v. *Commissioner*, 139 Fed. (2d) 242. In the *Edward J. Miller* case, Miller, an insurance agent representing several insurance companies, had placed insurance for his customers with an insurance company which later failed. As a protection and defense against attack upon his business, Miller voluntarily paid to his customers matured claims against the insolvent insurance company and, at his own cost, voluntarily reinsured his customers in a solvent company. The Board reversed the Commissioner and allowed these expenditures as "ordinary and necessary business expenses" deductions. In discussing the general question involved, among other things, we said:

What constitutes an allowable deduction for ordinary and necessary business expense often raises a difficult question under the facts, and quite as often requires a border-line decision. However, it is well settled that expenditures made to protect or to promote a taxpayer's business, and which do not result in the acquisition of a capital asset, are deductible. The difficulty sometimes lies in determining whether the acts done were motivated by a purpose to protect or to promote the business. For a comprehensive discussion of this point, and citation of authorities, see *First National Bank of Skowhegan, Maine*, 35 B. T. A. 876.

In the *Miller* case we distinguished *Welch* v. *Helvering*, *supra*, in the following language:

In *Welch* v. *Helvering*, * * * cited in respondent's brief, the taxpayer paid portions of the claims of former customers of a bankrupt corporation, of which he had been secretary, in order to strengthen his individual standing and credit, and to reestablish business relations with the corporation's former customers. The Court held that such expenditures were not deductible as ordinary and necessary business expenses. The present proceeding, in our opinion, does not come within the doctrine of the *Welch* case. There the expenditures were made to acquire, and not to retain or protect and promote the taxpayer's business. * * *

For the same reasons we gave in distinguishing *Welch* v. *Helvering* in the *Miller* case we think the facts of the instant case distinguish it from the *Welch* case. We think that the facts in the instant case show that the expenditures in question were made to protect and promote petitioner's business and did not result in the acquisition of a capital asset.

In *Robert Gaylord, Inc.*, *supra*, the Board allowed voluntary payments as "ordinary and necessary expenses." In that case the taxpayer was one of the contributors to a fund being raised in the city of St. Louis to save a large bank, the Franklin-American Trust Co., from complete failure and hasty liquidation. The taxpayer in that case was not engaged in the indemnity or guaranty business and had no direct financial stake in the insolvent bank. The contribution was made in an effort to avoid a general run on banks in the city of St. Louis and the resultant chaos, as well as to avoid the possible indirect detriment which could be suffered by the petitioner through failure to collect accounts from its customers in the event of a general run on city banks. We held that the contribution was a deductible expense.

In *Dunn & McCarthy, Inc.*, Docket No. 109554, memorandum opinion entered March 19, 1943, the material facts were that several salesmen of the petitioner had made personal loans to the sales manager, who later became the president of the company. The aggregate of such loans was a substantial amount. Petitioner's president thereafter died by his own hand without repaying the loans to the salesmen, and his estate was unable to respond because it was insolvent. A number of petitioner's customers knew of the foregoing situation, and one of the creditor salesmen made inquiry what the company was going to do about it. Its board of directors, being of the opinion that its failure to recognize and discharge its moral responsibility in regard to the loans would impair the attitude of the salesmen toward the company, injure morale in the organization, and also damage good will by giving rise to an adverse attitude on the part of customers, authorized the payment of the loans to the salesmen, which

was done. Petitioner deducted the sum so paid from its gross income in the year of payment. The Commissioner disallowed the deduction and we affirmed the Commissioner. However, we were reversed in *Dunn & McCarthy, Inc.* v. *Commissioner, supra* (C. C. A., 2d Cir.). The court, in reversing us and holding that the claimed deduction should be allowed as an "ordinary and necessary business expense," distinguished *Welch* v. *Helvering, supra*, along lines similar to those which we used in distinguishing it in *Edward J. Miller, supra*.

While it is, of course, true that the facts in the instant case are not the same as the facts of either of the three cases cited above, nevertheless we think the facts of the instant case bring it within the ambit of the three cases above cited and on their authority we decide the main issue for petitioner.

The Commissioner strongly relies upon *Welch* v. *Helvering, supra*, but for reasons which we have already mentioned we think the facts of the instant case are distinguishable. Another case which respondent urges in behalf of his determination is *Mitten Management, Inc.*, 29 B. T. A. 569, in which we relied upon and followed the Supreme Court's decision in *Welch* v. *Helvering, supra*. In the *Mitten Management, Inc.*, case, the taxpayer was engaged in the business of the management of corporations, firms, individuals, etc., with particular reference to the business of passenger transportation in municipalities and other kindred activities. The defunct bank in that case, Producers & Consumers Bank of Philadelphia, was an entirely independent enterprise, unconnected in any manner with the taxpayer, and its failure in 1925 cast no reflection or discredit of any kind upon the taxpayer and did not in any manner increase its burdens or problems of operations. As stated in the findings:

On February 1, 1926, an agreement was entered into between the receiver of the Producers & Consumers Bank and Thomas E. Mitten under which a new bank was to be formed by Mitten to take over the assets and assume a certain part of the deposit liabilities of the failed bank.

It seems clear, therefore, that the payment by Mitten Management, Inc., of the amounts which the defunct bank owed its depositors in that case was an entirely new undertaking on the part of Mitten Management, Inc., for the obvious motive of trying to create new and therefore nonexistent good will among a particular element in the community. It was not undertaken in an effort to retain or protect preexisting good will. These facts we think distinguish the *Mitten* case from the instant case.

Therefore, on the strength of the foregoing authorities we sustain petitioner in principle on issue 1. That does not mean, however, that we hold that petitioner is entitled to a deduction of the entire $240,-888.31 which is claimed on its income tax return for the fiscal year 1941

and which the Commissioner has disallowed. As we construe petitioner's brief, it no longer claims that it is entitled to that much deduction, and it is clear that it is not. The merchandise certificates which petitioner issued to the bank depositors were not unconditional obligations to pay in money, but were to be paid in merchandise. Petitioner would be entitled to deduct only the cost of such merchandise. That would be the extent of its payment to the former depositors of the bank. On this point petitioner states in its brief as follows:

It is believed, therefore, that the mere decision within the fiscal year ended July 31, 1941 to issue the Merchandise Purchase Certificates was insufficiently certain, as relates to the amount involved, to give rise to the accrual as of the date of the decision. The subsequent actual delivery of the Merchandise Purchase Certificates presented, however, an event certain in nature and amount, and it is believed that the Court may find that the accrual should have been made as of July 31, 1941 and July 31, 1942 on the basis of the Merchandise Purchase Certificates issued within each of these years and on the basis of other facts then known, such as the amount thereof applied as credits to accounts.

Petitioner then gives the following statement in its brief of the amounts of the deductions for the two fiscal years involved which it thinks should be made under the facts as proved:

| | Fiscal year ended July 31— | |
| --- | --- | --- |
| | 1941 | 1942 |
| Total Merchandise Purchase Certificates delivered | $213,828.26 | $4,998.70 |
| Amount credited to accounts | 17,563.51 | 1,611.81 |
| Remaining amounts ($196,264.75 and $3,386.89, respectively) which could be expected only to be redeemed through delivery of merchandise at the cost of 63.68% and 62.03% of retail selling prices, respectively | 124,981.39 | 2,100.89 |
| Amount of Merchandise Purchase Certificates issued in 1941 redeemed in 1942, $104,155.80 ($196,264.75 redeemed through delivery of merchandise in 1941 and 1942, less amount redeemed through delivery of merchandise in 1941, $92,108.95), at the gross profit differential 1.65% (37.97%—36.32%) | | 1,718.57 |
| | 142,544.90 | 1,994.13 |

Petitioner in its brief explains the foregoing deductions which it now claims as follows:

As of July 31, 1941 Merchandise Purchase Certificates in the amount (at retail selling prices) of $213,828.26 had been issued. Of these, $92,108.95 had been redeemed through the delivery of merchandise and $17,563.51 had been credited to customers' accounts receivable and other accounts. As of the close of business July 31, 1941 it was, therefore, definitely known that, of the Merchandise Purchase Certificates issued within that year, the amount of $17,-563.51 (the amount credited to customers' accounts receivable or other accounts) would constitute an expense in its entirety, while the remaining Merchandise Purchase Certificates issued in that year, namely $196,264.75, could only be assumed to be redeemed through the delivery of merchandise. The deduction with respect to the latter amount would, therefore, be limited to the known cost of such merchandise, namely 63.68% (see gross profit percentage, page 10 Stipulation) thereof, or $124,981.39, so that the total deduction for the year

ended July 31, 1941, if the Court should find that accrual should be made on the basis of facts known at that date, would amount to $142,544.90.

As relates to the fiscal year ended July 31, 1942, an amount of Merchandise Purchase Certificates of $4,998.70 was issued to claimants of the subsidiary Bank, while an amount of $106,526.45 was redeemed through delivery of merchandise at retail selling prices and a net amount of $1,611.81 was applied as credits to accounts. On the same basis, this latter amount would constitute, in total, an expense for the year 1942, while the remaining Merchandise Purchase Certificates issued within that year, namely $3,386.89, could be expected to be redeemed only through delivery of merchandise, and again the deduction, therefore, would necessarily be limited to cost relating to such merchandise during that year, namely 62.03% (see gross profit percentage, page 10 Stipulation) or $2,100.89.

Because of the fact, however, that a substantial portion of the Merchandise Purchase Certificates actually delivered within the fiscal year 1941 were not redeemed until the fiscal year 1942, coupled with the slightly higher prevailing percentage of gross profit in the latter year, the deduction computed for the year 1941 proves excessive to the extent of $1,718.57, this being represented by the amount of Merchandise Purchase Certificates issued in 1941 but redeemed, through delivery of merchandise, in 1942, namely $104,155.80, at the gross profit differential of 1.65%. On the basis of the known facts as of July 31, 1942, the net deduction for that year, if the Court should so find, would, therefore, become $1,994.13. * * *

We think the accruals shown in the foregoing statements made by petitioner in its brief represent the accruals which should reasonably be made in the determination of issue 1. Absolute accuracy would, of course, be impossible on account of the various departments in petitioner's store and the varying degrees of gross profit at which different articles of merchandise were sold. As stated by the Supreme Court of the United States in *Utah Power & Light Co.* v. *Pfost*, 286 U. S. 165:

Undoubtedly the administration of an act like this one is attended with some difficulty. Measurements and calculations are more or less complicated. Absolute precision in either probably cannot be attained, but that is so to a greater or less degree in respect of most taxing laws. If, for example, absolute exactness of determination in respect of net income, deductions, valuation, losses, obsolescence, depreciation, etc., were required in cases arising under the federal income tax law, it is safe to say that the revenue from that source would be much curtailed. The law, which is said not to require impossibilities, must be satisfied, in many of its applications with fair and reasonable approximations.

Therefore, in the light of all the facts we think the accruals suggested by petitioner and as explained above represent fair and reasonable approximations.

The Commissioner contends that we have no jurisdiction to determine the amount of petitioner's net income for the fiscal year 1942 because he has determined an overassessment in petitioner's income tax for the year 1942. Therefore, we should not render any decision as to proper accruals for that year. It is, of course, true

that, where the Commissioner has determined an overassessment in a taxpayer's income tax for a particular year, we have no jurisdiction to redetermine the overassessement for that year. But that is with reference to the income tax deficiency. Where in the same year the Commissioner has determined an excess profits tax deficiency against the same taxpayer, we do have jurisdiction to redetermine the excess profits tax deficiency. See *Pioneer Parachute Co.*, 4 T. C. 27.

Therefore, in a redetermination of petitioner's excess profits tax liability for the fiscal year 1942, effect should be given in whatever way may be proper to the accrual of $1,994.13 above determined for the fiscal year 1942. We shall make no effort, however, to redetermine any overassessment of petitioner's income tax for that fiscal year because we have no jurisdiction, the Commissioner having determined an overassessment in petitioner's income tax for the fiscal year 1942.

*Issue No. 2.*—This issue is raised by the following assignment of error:

(b) The commissioner erred in determining and asserting that the net income for the fiscal year ended July 31, 1941 should be adjusted in the amount of $240,888.31 in respect of such payments without reducing said amount of $240,888.31 by the profit included in income when the purchase certificates were redeemed by deliveries of merchandise at current selling prices.

In support of this assignment of error petitioner in its brief submits the following proposition: "No profit or gain was realized through the free delivery of merchandise to depositors of Scruggs, Vandervoort & Barney Bank." Petitioner argues in support of the foregoing proposition that, while the amounts of merchandise purchase certificates redeemed were reported on the books as sales at retail prices, this was done for accounting purposes, thereby increasing fictitiously gross profits for the fiscal years 1941 and 1942; that there was in fact no profit on redemption of the certificates; that book entries may not be used as a basis of taxing a profit which was never realized; and that the income determined by respondent should be reduced by the amounts of the fictitious gross profits of $33,453.97 and $40,448.09 for the fiscal years 1941 and 1942, respectively. The above gross profits were computed by taking the retail prices of goods redeemed under the certificates of $92,108.95 and $106,526.45 in 1941 and 1942 and the gross profits on sales for these years of 36.32 per cent and 37.97 per cent, respectively.

Respondent, while still insisting that petitioner is not entitled to any deduction by reason of the issuance of the merchandise purchase certificates, says in his brief:

\* \* \* If it be assumed, however, for the purpose of arguing this point, that the petitioner would have been entitled to a deduction for the voluntary gifts

it seems that the amount of the deduction which would be allowable would be the cost of the merchandise which was redeemed by the merchandise certificates plus the proportionate part of the expenses attributable to those goods. The proportionate part of the expenses, of course, has been deducted on petitioner's return as no segregation was made. * * *

We think petitioner must be sustained on this point. It seems clear that although petitioner reported the sales of merchandise delivered upon the presentation of these merchandise certificates as cash sales and accounted for them upon its books and income tax returns in that manner, it in fact received no cash payment for these goods and had no gross profits upon such sales.

The determination of the way these transactions should be handled, once the basic issue raised by issue No. 1 is decided, seems to be clearly a tax accounting problem. Cf. *Dobson* v. *Commissioner*, 320 U. S. 489. Petitioner contends in effect that it is entitled to $142,544.90 plus $33,453.97, or a total of $175,998.87 deductions, plus exclusions, for the fiscal year 1941, and $1,994.13 plus $40,448.09, or a total of $42,442.22, for the fiscal year 1942, or a grand total of deductions plus exclusions for both years of $218,441.09. This is $630.37 more than the total certificates that were redeemed, namely, $217,810.72. We think petitioner is entitled to deductions plus exclusions, spread over the two years as above indicated, limited, however, to a total of $217,810.72. This means that in a recomputation under Rule 50 petitioner is entitled to receive $175,998.87 as deductions, plus exclusions, for the fiscal year 1941 and $41,811.85 deductions, plus exclusions, for the fiscal year 1942.

As pointed out under issue No. 1, we have no jurisdiction to redetermine the amount of the overassessment of petitioner's income tax for the fiscal year 1942 and we make no attempt to do so. It is in the redetermination of petitioner's excess profits tax for the fiscal year 1942 that the adjustment for 1942 herein directed should be used in a recomputation under Rule 50.

*Issues Nos. 3 and 4.*—The questions raised under issues Nos. 3 and 4 as to the excess profits credit carry-over from the fiscal year ended July 31, 1941, to the fiscal year ended July 31, 1942, and the reduction of equity invested capital for the fiscal year ended July 31, 1942, are contingent upon our decision of issues Nos. 1 and 2. On this subject respondent says in his brief:

* * * The statement of the petitioner alleging that the Commissioner erred in eliminating the amount of the excess-profit credit carry-over from the fiscal year ended July 31, 1941 to the fiscal year ended July 31, 1942, and in reducing equity invested capital for the fiscal year ended July 31, 1942 in the amount of the deficiency asserted for the fiscal year ended July 31, 1941, are contingent upon a reversal of the Commissioner's disallowance of the claimed deduction. Should this court change the disallowance of the deduction, it does not appear

that there will be any controversy relative to making the proper adjustments in petitioner's tax.

Petitioner does not argue to the contrary in its brief. Therefore, it will be assumed that a proper adjustment of the matters raised by issues 3 and 4 will be taken care of in a recomputation under Rule 50.

*Decision will be entered under Rule 50.*