## FRIEDMAN v. DELANEY, Collector.
### Civ. A. No. 6121.

District Court, D. Massachusetts.
Feb. 2, 1948.

Paul D. Turner and Friedman, Atherton, King & Turner, all of Boston, Mass., for plaintiff.

William T. McCarthy, U. S. Atty., and Gerald J. McCarthy, Asst. U. S. Atty., both of Boston, Mass., Theron Lamar Caudle, Asst. Atty. Gen., and Andrew D. Sharpe and Paul S. McMahon, Sp. Assts. to Atty. Gen., for defendant.

WYZANSKI, District Judge.

Mr. Lee M. Friedman, the taxpayer, is a lawyer who has been at the bar for over fifty years and is the senior member of a widely known Boston law firm. About the time of World War I he and his firm began to act as counsel for Mr. Louis H. Wax, who was then a young man. They acted as Mr. Wax's attorneys in many business transactions for two decades. In 1937 Mr. Wax, finding himself in financial difficulties, decided to abandon the business he indivi-

dually had been conducting and to join Messrs. Goffman and Kaufman who were carrying on business under the name "Gofkauf." On Mr. Friedman's advice Mr. Wax proposed that his individual creditors should accept a settlement of 10 cents on the dollar. The settlement required about $8,000. Some of that money was promised by, and actually was in due course paid by, Messrs. Goffman and Kaufman [R. 13, 19. Ex. 2.]. Mr. Wax told Mr. Friedman that $5,000 would be forthcoming from an insurance policy on his life payable to his wife and not available to his creditors without her consent. (R. 13.) Mr. Friedman who actually had the policy in his possession then began to confer with counsel for Mr. Wax's creditors. Included were Mr. Cohn of Cohn & Riemir, Mr. Kagan of Richmond, Rosen & Kagan and Mr. Cook of Phipps, Durgin & Cook. (R. 14-15.) He told each of these attorneys about the arrangement with Gofkauf and with Mrs. Wax. Mr. Friedman states that he told each attorney "I had that policy and I knew that I would get that money and I would see that he got the dividend if he induced his creditors to accept." (R. 15.) In these conversations and in his conversations with the referee Mr. Friedman did not represent that he personally would pay Mr. Wax's creditors. He merely told attorneys for Mr. Wax's creditors that he was morally certain that Mr. Wax would carry out what he said he would do (R. 16, 21). Mr. Friedman made the same sort of representation to the referee in bankruptcy. As Mr. Friedman testified, "I never made a statement to the court [to the referee] that I personally would pay the money. I never said that to the court. But I said that I was in a position to give the court the assurance that if that composition was accepted and confirmed, that the money was available for carrying it through." (R. 21-22A.) This, as Mr. Friedman explained, did not mean necessarily that the money would come from either Mr. Wax or Mr. Friedman (R. 34).

Ultimately Mr. and Mrs. Wax refused to make the insurance policy available to the creditors. (R. 20, 33.) Without telling Mr. Wax, without intending to subject Wax to any legal obligation to reimburse him (R. 25) and wholly because he had involved himself in commitments to other attorneys and to the referee, Mr. Friedman in February 1938 deposited with the Clerk of Court his own personal $5,000 and $2,000 from other sources—presumably Messrs. Goffman and Kaufman—making a total of $7,000. (R. 22A-B, 32.) This deposit included a caveat that no part of it had been paid or contributed by Mr. Wax and that it was not a part of his estate (Ex. 6.) The caveat did not state that the deposit was a special deposit or a deposit in escrow. It was merely an indication that the money was not from the assets of the bankrupt but was from assets of other persons. It was the type of caveat that would have been proper if the money came from Mrs. Wax, from any stranger, from proceeds of an insurance policy, or from any other source.

In the summer of 1938 Mr. Friedman told Mr. Wax about the deposit of $5,000. (R. 26-27.) Mr. Wax refused to reimburse Mr. Friedman. Then in 1939 Mr. Friedman filed a petition with the referee to recover the $5,000. (R. 28.) In 1941 the referee issued an order denying the petition. (R. 28, 35, 38. Ex. 8.)

In his 1941 income tax return, Mr. Friedman, reporting on a cash basis, sought to deduct from gross income the $5,000 as a "bad debt." The Commissioner disallowed the deduction and assessed a deficiency. Mr. Friedman paid the Collector, filed a claim of refund and, after waiting the appropriate six months, brought this suit against the Collector.

Both parties have treated this case as though the only issues were whether the $5,000 was deductible either as a business expense under § 23(a) (1) or a loss under § 23(e) (1) of the Internal Revenue Code, 26 U.S.C.A. Int.Rev. Code, § 23(a) (1), (e) (1). They agree it is not to be considered a bad debt deduction.

I shall deal with the two issues which are presented to me by counsel. But I shall rest my conclusion not only on those two issues but also on the ruling that in my opinion a deduction of the $5,000 if it were ever proper was proper only in 1938.

It was in 1938 that Mr. Friedman deposited with the Clerk of the District Court of the United States $7,000—a sum derived

apparently from two sources, $5,000 from Mr. Friedman and $2,000 from Messrs. Goffman and Kaufman. In making the deposit of his own funds Mr. Friedman was not acting as agent for his client nor as his client's banker. He made the payment without regarding himself as having any legal right to receive its equivalent from Mr. Wax (R. 25-26). At the time of the deposit Mr. Friedman filed a caveat that "no part of said deposit has been paid or contributed by the alleged bankrupt [Mr. Wax] * . * .* and no part of said deposit * * * [is] a part of the estate of the * * * alleged bankrupt [Mr. Wax]." (Ex. 6.) This caveat was a mere label of origin not a restriction on destination. Despite the caveat, the clerk, the referee and the court received the fund as trustees for creditors and others interested in Mr. Wax's estate. Mr. Friedman had no interest in the fund except the interest that every settlor has in a trust which does not cover every possible contingency. That is, if the creditors of Mr. Wax and others interested in his estate were not awarded the deposit by the referee, then Mr. Friedman and the other contributors would have been entitled to a return of their deposit. This would have been on the ground that a resulting trust arose on the failure of the express trust. Cf. Scott on Trusts, § 411; Restatement, Trusts § 404 and preceding introductory note.

I had not supposed that any one would contend that a taxpayer, keeping his books on a cash basis, who paid a sum to trustees for a purpose which would ordinarily give rise to a tax deduction should be denied the deduction merely because it was theoretically possible that the express trust would fail and, under the principles of resulting trusts, the res would be returned to the settlor. In any event, if the contention is ever open, it is not available here where the payment in 1938 by the settlor was made under circumstances where he could not reasonably anticipate a resulting trust—and where in fact the referee refused to allow one to occur.

On the assumption that I am mistaken as to what would be the appropriate year for taking a deduction of the $5,000, if it were permitted by law, I now turn to the contentions made by the taxpayer and the government in their briefs.

Plaintiff's first contention is that an attorney who in the course of handling his client's case gives his word that a certain sum will be forthcoming to meet his client's obligations and who himself pays when his client does not pay has within the meaning of § 23(a) (1) of the Internal Revenue Code paid an "ordinary and necessary" expense "in carrying on business." The unsoundness of the contention seems to be demonstrable by the following analysis.

1. If a lawyer pays the debt of his client the payment is not deductible, regardless of whether the payment was requisite to keep in business a client who had brought, was bringing and was expected to bring much legal work to the lawyer. There are several reasons for holding that the deduction does not come within § 23(a) (1). The payment proximately results not from carrying on the taxpayer's business but from carrying on the client's business. Deputy v. DuPont, 308 U.S. 488, 494, 60 S. Ct. 363, 84 L.Ed. 416. There is no evidence that it is a transaction of common or frequent occurrence in the business of practicing law. Id., 308 U.S. p. 495, 60 S.Ct. 367. And such a payment, even if made with an eye to the continuation of existing retainers and not merely in gratitude for past patronage and expectation of future fees, comes closer to a capital outlay than to ordinary and necessary expenses in the operation of a law business. Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212.

2. If a lawyer makes a payment to fulfill a moral promise arising out of matters dissociated from his business but for the sole purpose of preserving his professional reputation, the payment is for two reasons not deductible: it is not an expense paid "in carrying on business"; and it is not an ordinary expense. Cf. Deputy v. DuPont, supra. Thus a lawyer could not utilize the provisions of § 23(a) (1) to deduct the payment of a gambling debt of honor even though the sole motive for the payment was to avoid the professional injury he would suffer from acquiring the reputation of a welcher.

3. If, as in the case at bar, a lawyer makes a payment to fulfill a moral promise made in connection with his practice at law, he cannot have a deduction under § 23(a) (1) unless he can affirmatively answer two questions: (a) was the payment directly and proximately related to the business and (b) was it ordinary and necessary. "Whether an expenditure is directly related to a business and whether it is ordinary and necessary are doubtless pure questions of fact in most instances". Commissioner v. Heininger, 320 U.S. 467, 475, 64 S.Ct. 249, 254, 88 L.Ed. 171. And in this case the facts do not justify an affirmative answer to either question.

(a) As pointed out in paragraph numbered 1, a lawyer's payment of a client's debt is not, so far as concerns § 23(a) (1), a proximate result of carrying on a lawyer's business. How can there be a different conclusion, so far as concerns § 23(a) (1), when there is involved a lawyer's payment pursuant to a lawyer's moral promise that money would be available to meet a client's debt? No one could justifiably say that a manufacturer who would not be allowed to use § 23(a) (1) to deduct amounts paid to discharge his customer's debts, would be allowed to deduct amounts paid to discharge his moral promise to cover his customer's debts. It certainly cannot be successfully argued that the manufacturer's case is distinguishable because the lawyer's business is keeping moral promises. High fidelity is, of course, an essential attribute of the lawyer. But for the purpose of a deduction under § 23(a) (1) keeping a promise is not carrying on a lawyer's business unless the performance promised would itself be carrying on a lawyer's business.

(b) Moreover, the payment of $5,000 in the case at bar was not an "ordinary" expense. If Mr. Friedman should now seek to recover from his law partners pro rata contributions to his $5,000 disbursement on the theory that he and his partners embarked on a common enterprise in which he had authority to incur ordinary expenditures in carrying on legal business, I suppose no one would conclude that the partners were accountable. The partners might even contend that a member of the bar had no right to undertake in a composition proceeding in this court to promise even indirectly that his client or some one on his client's behalf would fulfill his obligation. (Local Rule 4 of the United States District Court for the District of Massachusetts.) Perhaps the question of what is an ordinary expenditure may be differently answered when the issue arises between a man and his partners than when the issue arises between a taxpayer and a tax collector. Yet in the absence of any evidence as to what is the custom in the legal profession (Cf. Deputy v. DuPont, supra, pages 496, 497 of 308 U.S. pages 367, 368 of 60 S.Ct., Welch v. Helvering, supra, page 115 of 290 U.S., page 9 of 54 S.Ct.), there is no basis for a court assuming or finding that it is usual for attorneys who have stated that certain payments will be made on behalf of their clients, and who have been disappointed by their clients, or their clients' relatives and friends, to pay out of their own pockets their clients' obligations.

Dunn & McCarthy v. Commissioner, 2 Cir., 139 F.2d 242, Helvering v. Community Bond & Mortgage Corp., 2 Cir., 74 F.2d 727 and Scruggs-Vandervoot-Barney Inc. v. Commissioner, 7 T.C. 779 are distinguishable, as can be illustrated by an analysis of the first of those cases. The amount paid was not to discharge the taxpayer's moral promise. It was to discharge a legal promise of a third person whose relationship to the taxpayer was such that if the taxpayer did not pay the debt, the taxpayer would lose its existing employee good-will and customer good-will. And the taxpayer's direct discharge of that third person's legal liability was held to be as a matter of fact proximately related to the taxpayer's business. The case at bar is different because (as paragraph numbered 1 states) if plaintiff had (without any intervening promise) directly discharged his client's debt, it would not be held to be so proximately related to plaintiff's business as to be deductible under § 23(a) (1).

Plaintiff also seeks to deduct the $5,000 under § 23(e) (1) of the Internal Revenue Code as a loss "sustained during the taxable year" and "incurred in business". Without pausing to consider all possible difficulties I reject plaintiff's second contention on the ground that if there were

a "loss", and if the loss were "sustained during" 1941, it was nonetheless not "incurred in business". There is no reason to expatiate on this ruling for ultimately it turns on the same considerations as led me to conclude that the payment did not come within § 23(a) (1) because it was not made "in carrying on business". Cf. Burnet v. Clark, 287 U.S. 410, 53 S.Ct. 207, 77 L.Ed. 397. Sam P. Wallingford Grain Corp. v. Commissioner, 10 Cir., 74 F.2d 453.

Judgment for defendant with costs.