Maurice Artstein and Isabel Artstein v. Commissioner.
Artstein v. Commissioner
Docket No. 2828-68.
United States Tax Court
T.C. Memo 1970-220; 1970 Tax Ct. Memo LEXIS 140; 29 T.C.M. (CCH) 961; T.C.M. (RIA) 70220; July 29, 1970, Filed Charles M. Shaw, 225 S. Meramec, Clayton, Mo., for the petitioners.Thomas J. Stevens, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the taxable years 1965 and 1966 in the respective amounts of $1,783.55 and $6,527.34. Some of the issues raised by the pleadings have been disposed of by agreement of the parties leaving for our decision the following: (1) Whether petitioner is entitled to deduct as a trade or business expense attorneys' fees paid in the year 1965. (2) Whether petitioner is entitled to deduct in 1966 as a business bad debt the amount of a loan made in 1963 to his corporate employers which became worthless in 1966. Findings of Fact Some of the *141 facts have been stipulated and are found accordingly. Petitioners, Maurice and Isabel Artstein, resided, at the time of the filing of the petition in this case, in Ladue, Missouri. They filed joint Federal income tax returns for the calendar years 1965 and 1966 with the district director of internal revenue, St. Louis, Missouri. Maurice Artstein (hereinafter referred to as petitioner) was employed by Edison Brothers Stores in St. Louis, Missouri for 25 years as operational head of the Chandler Division, a group of stores within the Edison Brothers corporate entity. His duties for Chandler included styling and purchasing footwear. In December of 1962, petitioner left Edison Brothers because of a disagreement with new management over corporate policies. He took employment in the first week of January 1963 as sales manager, stylist, and designer for the Port Shoe Corporation (hereinafter referred to as Port) and Ruth Shoe Company (hereinafter referred to as Ruth) in Newberry, Massachusetts. Petitioner's salary from Port and Ruth was $650 per week. Although petitioner had no ownership interest in Port or Ruth, he had accepted the position on the understanding that he could buy into *142 the corporations after the first year if the firms' volume improved by a specified amount and petitioner intended to eventually invest in the companies. Textile Banking Company, Inc. (hereinafter referred to as Textile), until sometime in May 1963, had been factoring the accounts of Port and Ruth. In May 1963, representatives of Textile became aware that certain information as to the companies' financial condition was not as reported to them, and Textile refused to continue to factor the accounts of Port and Ruth. Petitioner had designed a line of shoes for Port and Ruth, and had sold approximately $1.5 million worth to his business friends and associates. Petitioner did not wish to hurt his reputation by being unable to deliver the shoes he had sold. He went to Textile and explained the situation to representatives of Textile. He assured the representatives of Textile that the shoes he had sold would be accepted by the purchasers and asked Textile to continue factoring the accounts of Port and Ruth so that the companies could meet their payroll and complete the manufacture of the shoes he had sold. Textile agreed to advance the mony for Port and Ruth to meet their payrolls but only *143 on condition that the officers of those companies and petitioner sign the notes for the advances. On May 10, 1963, Textile made a loan of $40,000 to Maurice Blackman, Philip Blackman, Philip Feigenbaum, the principal stockholders of Port and Ruth, and petitioner, taking from them a demand note in that amount signed by each of them, jointly and severally. Textile issued two $20,000 checks made out to the four individuals, who endorsed the checks, depositing one to Port's account and the other to Ruth's. The companies each executed a $20,000 note to the individuals, payable jointly. On May 17 the same procedure was followed with respect to a $30,000 loan to the four individuals from Textile and from the four individuals to Port and Ruth. On May 20, 1963, Textile made a loan of $25,000 to the four individuals, evidenced by a demand note, signed jointly and severally by them. The check was issued to petitioner alone, and he endorsed it to Port. These sums were used by the corporations primarily for payroll and payroll taxes. Petitioner was not required by his employer to become involved in these transactions, 963 although his own salary was part of the payroll for which the loans *144 were obtained. In June 1963 Port and Ruth petitioned for reorganization under chapter XI of the Bankruptcy Act and went into bankruptcy in the fall of 1963. At approximately the time that Port and Ruth filed their petitions for reorganization petitioner left their employ. He never invested in the stock of Port and Ruth. About 3 weeks after leaving the employ of Port and Ruth, petitioner became employed by another company as a shoe designer and sales manager at substantially the same salary he had received from Port and Ruth. Textile on November 8, 1964, made demand upon petitioner for payment of the notes, and on March 5, 1965, brought suit against him in the United States District Court for the Eastern District of Missouri. The Court issued its Findings of Fact and Conclusions of Law in the case and entered judgment against petitioner and for Textile in the sum of $95,000 plus interest and $10,000 attorneys' fee on December 7, 1965. Petitioner did not have the funds to pay this judgment and therefore immediately filed a voluntary petition in bankruptcy. At about the time the judgment was entered by the District Court petitioner paid his attorney $4,750 for services rendered in *145 defending that suit, in connection with a separation of petitioner and his wife, and in filing his petition in bankruptcy. These attorneys were required to turn over to the trustee in petitioner's bankruptcy $3,850 of the amount received from the petitioner. The $900 retained by the attorneys was the amount of the payment allocated to filing the petition in bankruptcy. During 1966 petitioner settled his liability to Textile on the judgment by agreeing to pay to Textile $30,000 over a 3-year period. The amounts which had been collected by the trustee in bankruptcy were turned over to Textile which was the only listed creditor in the bankruptcy proceeding and petitioner during the years 1967 and 1968 completed payment of the balance of the $30,000. After the settlement with Textile petitioner dismissed his petition in bankruptcy. Port and Ruth were indebted to petitioner in the amount of $20,535 and this indebtedness became worthless in 1966. Petitioner on his income tax return for the calendar year 1965 deducted as attorneys' fees the amount of $4,750. Respondent in his notice of deficiency disallowed this deduction with the explanation that it had not been established that petitioner *146 was entitled to such a deduction nor that the amount was expended for the purpose designated. Petitioner on his income tax return for the calendar year 1966 deducted as "loss as guarantor on business obligation" the amount of $20,535. Respondent in his notice of deficiency disallowed this deduction with the explanation that it had been determined that the loss claimed in this amount on petitioner's return resulted from payments made as a "guarantor on notes and is not allowable as a business bad debt" and that "it has not been established that such loss was incurred in a trade or business." Respondent treated the claimed "loss" as a shortterm capital loss, allowing a deduction of $1,000 of the amount in the year 1966. Opinion Petitioner, in his brief, makes no argument with respect to the deductibility of the $900 amount of attorneys' fees. The balance was conceded at the trial not to be deductible. However, no statement is made that petitioner is abandoning his contention with respect to the deductibility of attorneys' fees in the amount of $900. The evidence shows that the $900 of attorneys' fees was incurred by petitioner in connection with the filing of a personal petition *147 in bankruptcy. There is no showing that the bankruptcy petition was in any way connected with any trade or business of petitioner. We recognize that this petition was filed because of a judgment obtained against petitioner in connection with a transaction which originated because of circumstances connected with petitioner's business activities. However, in our view, this record is insufficient to show the proximate relationship of the filing of the bankruptcy petition to petitioner's trade or business necessary to support the deductibility of the attorneys' fees as a trade or business expense or an expense in connection with a transaction entered into for profit. The major issue in this case is whether the debts of Port and Ruth to petitioner which became worthless in 1966 are deductible as a business bad debt. Section 166, I.R.C. 1954, [1] provides for the deduction of any debt which becomes worthless within 964 the taxable year. However, under section 166(d), [2] where a nonbusiness debt of an individual becomes worthless the resultant loss is considered as a loss *148 from the sale or exchange of a capital asset held for not more than 6 months. A non-business debt is defined by statute as a debt other than one created or acquired in connection with a trade or business of the taxpayer or a debt, the loss from the worthlessness of which is incurred in the taxpayer's trade or business. *149 In the instant case petitioner claimed the deduction in connection with his transactions with Port and Ruth as a loss on the guarantee of notes, and respondent in his notice of deficiency referred to petitioner's loss as a loss as a guarantor of notes. However, at the trial the parties stipulated that in fact petitioner had not guaranteed notes of Port or Ruth but had made loans to those corporations from money which he had borrowed. The parties further stipulated that Port and Ruth were indebted to petitioner in the amount of $20,535 and that this indebtedness became worthless in 1966. In view of these stipulations of the parties our only issue here is whether the debts of Port and Ruth to petitioner were business or nonbusiness debts. Petitioner, in his brief, argues the issue as if the indebtedness arose because of his having paid notes of Port and Ruth which he guaranteed. However, in view of the stipulation between the parties at the trial, we have considered petitioner's argument to be directed toward the contention that the debts of Port and Ruth to him were business bad debts. There are numerous cases dealing with loans made by an individual to a corporation of which *150 he is both a stockholder and employee. In some of the cases the issue of whether the making of the loan is motivated by the taxpayer's interests as an investor or his position as an employee is considered. The difference in an investor's interest in a corporation which is engaged in a business separate and distinct from that of the taxpayer-investor, individually, and a taxpayer's own trade or business is discussed in Whipple v. Commissioner, 373 U.S. 193 (1963). While the law is clear that the trade or business of a corporate stockholder or employee is to be distinguished from the trade or business of the corporation, cases have continued to arise concerning whether a loan made to a corporation is sufficiently related to an individual's trade or business as an employee to be considered as created or incurred in connection with the individual's trade or business of being an employee. In the instant case petitioner owned no stock in Port or Ruth and in our view the record shows that at the time the loans here in issue were made petitioner was not actively contemplating investing *151 in Port and Ruth. The record shows that petitioner's loans to Port and Ruth were not made as an investor or because of any contemplation of investment in those corporations in the future. On the basis of the facts in this record we do not agree with respondent's contention that petitioner's loans to Port and Ruth were motivated by his intention to become an investor in those corporations at a future date. Respondent's primary contention is that the record does not show what motivated petitioner to make loans to Port and Ruth. Respondent argues that petitioner's motivation could not have been to keep his position with Port and Ruth. To support this argument respondent points to the fact that petitioner had been employed only a short time by Port and Ruth, and after leaving the employ of these companies was able to secure employment similar to that which he had with Port and Ruth with another corporation at substantially the same salary. [3]
*152 965 While we agree with respondent that petitioner did not make loans to Port and Ruth for the purpose of protecting or maintaining his position with those corporations, we do not agree that the record does not show the reason why petitioner made the loans. In our view the record is clear that petitioner made the loans to Port and Ruth to enable the corporations to complete and ship shoes which petitioner had sold. This is clear from the testimony taken at the trial of this case and also from the deposition of petitioner taken in connection with Textile's suit against him, which deposition the parties stipulated into the record in this case. Over a period of 25 years petitioner had established a reputation in the shoe industry as a stylist and salesman. While with Port and Ruth, he had made sales to business friends and associates and he felt impelled for the protection of his own reputation and his own position in the industry to have Port and Ruth deliver the shoes he had sold. [4] The record, in our view, shows that petitioner made the loans to Port and Ruth to maintain his standing, position, reputation, and employability in general as a designer and salesman of shoes. In *153 our view, the only reason or purpose for the loans was business motivated and the essence of the question here is whether the motivation was such that had it been a direct expenditure as distinguished from a loan, it would be viewed as a capital investment as distinguished from a business expenditure. The line between payments, or as here loans, which are made to protect the general reputation of an individual which is akin to a capital asset and those which are made to protect currently existing business relations which are considered as business expenses, is not a clearly defined one. See the distinction in the payment made in Welch v. Helvering, 290 U.S. 111 (1933), and payments made by a department store to depositors in a bank, the stock of which was primarily owned by the department store, in Scruggs-Vandervoort-Barney, Inc., 7 T.C. 779, 786-787 (1946). In Scruggs-Vandervoort-Barney, Inc., we held the payments to the bank depositors to be deductible business expenses since they were made to keep the goodwill of customers of the department store. We have also recognized worthless debts resulting from loans made by a business or professional man in an *154 effort to retain and hold clients and maintain his reputation to result in business bad debts. Stuart Bart, 21 T.C. 880 (1954). *155 Had petitioner been a free-lance shoe designer and made the advances to Port and Ruth so that shoes which he had designed could be delivered, this case would clearly fall within our holding in such cases as Stuart Bart, supra. Since petitioner was an employee, we must decide whether being a shoe designer and a salesman on an employee basis is such an occupation as to cause a loan proximately related to that occupation to be a business loan. In David J. Primuth, 54 T.C. 374 (1970), we held that an individual could be engaged in 966 a trade or business of being an employee stating at 378: The obvious principle to be evolved from the Furner [Furner v. Commissioner, 393 F. 2d 292 (C.A. 7, 1968), reversing 47 T.C. 165 (1966)'] and Haft [Harold Haft, 40 T.C. 2, 6 (1963)] cases is that it is possible for an employee to retain, at least temporarily, his status of carrying on his own trade or business independent of receiving any compensation from a particular employer. This being so, it certainly cannot be held against the petitioner that, while actively and gainfully carrying on his trade or business of being *156 a corporate executive, he incurred an expense with a view to receiving his paychecks from a different employer than the one for whom he was working at the time of payment. In the instant case petitioner made the loan to Port and Ruth in order to protect his reputation and employability as a designer and salesman of shoes, whether it was for Port and Ruth or some other employer. Petitioner was probably reasonably aware that his employment with Port and Ruth would not be long continued at the time he made the loans. It also may be, as respondent contends, that petitioner was aware that he could obtain other employment as a designer and salesman of shoes without great difficulty. However, in our view, petitioner made the loans to Port and Ruth for the purpose of maintaining his reputation and employability as a designer and salesman of shoes and assuring his continued ability to easily obtain employment in such a capacity. Since we have recognized in David J. Primuth, supra, that an individual may be engaged independently in a trade or business as a corporate employee, it follows that loans made by petitioner for the purpose of protecting his reputation and employability *157 were made in connection with his individual trade or business. We hold that petitioner is entitled to deduct the $20,535 worthless debt from Port and Ruth as a business bad debt. Decision will be entered under Rule 50. Footnotes
1. All references are to the Internal Revenue Code of 1954. ↩
2. "Sec. 166(d) Nonbusiness Debts. - "(1) General rule. - In the case of a taxpayer other than a corporation - "(A) subsections (a) and (c) shall not apply to any nonbusiness debt; and "(B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. "(2) Nonbusiness debt defined. - For purposes of paragraph (1), the term 'nonbusiness debt' means a debt other than - "(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or "(B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business."↩
3. Respondent cites, discusses, and distinguishes three fairly recent cases in which we have held that loans made by an employee to his corporate employer were for the purpose of protecting his job with the corporation and therefore proximately related to the taxpayer's trade or business as an employee of the corporation. These cases are Estate of Kent Avery, T.C. Memo. 1969-64; Isidor Jaffe, T.C. Memo. 1967-215; and Philip W. Fitzpatrick, T.C. Memo. 1967-1↩.
4. Petitioner, in response to a question as to why he signed the notes to procure the money to lend to Port and Ruth, answered as follows: Unbeknownst to me when I was employed by Ruth and Port Shoe Company, the Ruth and the Port Shoe Company were in some financial trouble. I was not made aware of this and did not know this at the time. After being employed by them over a period of approximately four months, about four months, it was brought to my attention that they were financially in trouble, the businesses were being factored by a Textile Banking company in New York City. Textile Banking also found out that the company was not as reported to them by the principals of the company. Therefore, they quit so-called factoring or sending monies down to the Ruth and the Port Shoe Companies, monies sent down to purchase materials to make shoes, monies for payrolls and so forth and so on to operate the business, whatever had to be purchased and whatever had to be paid for. I personally had gone out and designed a line of shoes for that particular season, and I personally had sold approximately, to associates and friends of mine in the business, I went out with these designs that I had created and made, I had sold approximately a million and a half dollars worth of footwear, which is quite a bit of footwear at a six and a half, seven dollar per pair price. As you can see, it is a lot of shoes. I did not wish to hurt my reputation, I did not wish to not be able to deliver these shoes to friends of mine who had not previously purchased from this factory, and I went to the Textile Banking Company and explained all this to them very carefully and I told them that these shoes were sold and that these shoes would be accepted and I did not see any reason why they could not continue to factor for the amount of shoes that were in process in this factory so that they could be finished and delivered to the customers who, in all good intentions, purchased the shoes from the factory. They agreed that they would allow these shoes to be finished and they insisted at that point that they would pay the payrolls for the firm, but they would want the principals and myself to sign for these payrolls. When they made out the drafts, they had listed on the drafts president, vice president, so forth and so on, I don't know exactly, perhaps we have the exhibits that would show it, and they asked me to sign at that particular location which I did for the payrolls.↩