CUBBEDGE SNOW AND FRANCES C. SNOW, PETITIONERS, *v.* COMMIS-
SIONER OF INTERNAL REVENUE, RESPONDENT.

T. BALDWIN MARTIN AND MARY B. M. MARTIN, PETITIONERS, *v.* COM-
MISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 65527, 65528.   Filed December 23, 1958.

*Cubbedge Snow* and *T. Baldwin Martin, pro se.*
*Sanford P. Keziah, Esq.,* for the respondent.

FISHER, *Judge:* This consolidated proceeding involves deficiencies
determined against petitioners as follows:

| Docket No. | Petitioner | Year | Income tax deficiency |
|---|---|---|---|
| 65527 | Cubbedge and Frances C. Snow | 1954 | $534.24 |
| 65528 | T. Baldwin and Mary B. M. Martin | 1954 | 568.34 |

The sole issue presented for our decision herein is whether peti-
tioners are entitled to deduct payments (each in the amount of
$1,136.70) during the taxable year 1954, made pursuant to an agree-
ment to guarantee the deficits of a newly organized savings and loan
association, as ordinary and necessary business expenses of their law
firm under section 162 (a), Code of 1954.

### FINDINGS OF FACT.

Most of the facts are stipulated and, as stipulated, are incorporated
herein by this reference.

Cubbedge and Frances C. Snow and T. Baldwin and Mary B. M. Martin, husband and wife, respectively, are residents of Macon, Georgia. They filed joint Federal income tax returns for the calendar year 1954 with the district director of internal revenue of Atlanta, Georgia.

During the taxable year 1945, Cubbedge Snow and T. Baldwin Martin, hereinafter sometimes called petitioners, were member-partners in the law firm of Martin, Snow & Grant, consisting of T. Baldwin Martin, Cubbedge Snow, George C. Grant, Hendley V. Napier, and T. Baldwin Martin, Jr. (hereinafter referred to as law partnership), and were engaged in the general practice of civil law in Macon, Bibb County, Georgia. Petitioners each had a 35 per cent interest in said law partnership. The firm and its predecessors had been continuously engaged in the practice of law in Macon since 1890.

For many years prior to 1953, the law partnership and its predecessor firms had derived substantial fees from the making of abstracts and rendering opinions as to titles to real estate for lenders of money with realty as security. The law partnership had accumulated abstracts or back titles to practically every subdivision in Bibb County, as well as cross-checks of conveyances made by the larger real estate dealers (known as an "abstract plant"), thus enabling them to check titles and render opinions thereon very profitably.

In Macon, Georgia, the standard attorney's fee for abstracts and opinions is 1 per cent of the purchase price or loan, plus $25.

After World War II, individual lenders who at one time had supplied a great part of the loan money on real estate in Bibb County, many of whom were clients of petitioners' law firm, were to a large extent eliminated from the money market. Likewise, in 1952, a client of petitioners, the "Investor Syndicate" (a national lending institution), which had, since the war, made a great number of real estate loans in Bibb County, withdrew from the Macon area. As a result, the law partnership's fees from abstracts declined.

Some of the members of the partnership were concerned about diminished income from abstract fees and also by the fact that their cross-checks were not being kept up to date by the making of the abstracts for occasional purchasers.

Bibb County has a population of approximately 150,000 people. During 1952, there was only one Federal savings and loan association in Bibb County, the Macon Federal Savings and Loan Association, which was doing a large loan business and producing steady and substantial fees for the law firm which represented it. Petitioners' law firm did not represent said association.

Rules of the Home Loan Bank Board, Greensboro, North Carolina, which govern the activities of Federal savings and loan associations in the Macon area, prescribe that loans must be supported by certifi-

cates of the association's attorney that the deeds to secure loans constitute a first lien on real estate. Petitioners and the other members of their law firm believed that an additional source of income from the title abstracting facet of their law practice would be provided if they organized a Federal savings and loan association and secured all of its abstract business.

After making inquiries of lawyers in Atlanta, Georgia, where there were a number of Federal savings and loan associations, and after a personal conference by Martin with officers of the Federal Home Loan Bank in Greensboro, the law partnership decided to obtain authority to organize another Federal savings and loan association in Macon. To this end, they called together eight of their close friends and clients and laid before them their proposal to form a Federal savings and loan association with these men and Martin as directors and proxy committee.

The directors, except for Martin, were to be engaged more or less in a "civic enterprise" which envisaged the further economic growth of their community. Petitioners advised the prospective directors that they could not anticipate any financial gain from their position and that the first year's operation of the Federal savings and loan association would probably operate at a deficit. Petitioners also explained to the group that the law firm would benefit materially from the organization of a Federal savings and loan association in that the firm would receive legal fees for rendering opinions in connection with loans made by the association, and that, therefore, the law partnership would defray the expense of organizing the association and would pay any operating losses until it was on a profitable basis.

The prospective directors, including Martin, agreed to act as applicants for a charter, and on September 18, 1953, an application for a charter was submitted to the Federal Home Loan Bank at Greensboro, North Carolina. Said application contained the following questions which were answered in the affirmative by the applicants:

5. Would guarantors, acceptable to the Home Loan Bank Board, agree that if at the end of any of the first six semi-annual accounting periods of the association's operations there exists an operating deficit after the payment of all expenses incurred, provisions for dividends and proper allocations to reserves and undivided profits, *the amount of such deficit or deficits will forthwith be contributed to the association in cash and without liability on the association for refund thereof?*—YES. [Emphasis added.]

6. Would such guarantors hypothecate shares with the Federal Home Loan Bank of Greensboro in an amount to be determined by the Home Loan Bank Board as a pledge and guaranty to the association against losses of any and all kinds which exceed the association's reserves; said pledge and agreement to remain in full force and effect for a period of three years until the aggregate

amount of the association's net reserves and undivided profits attains a figure as may be required by the Home Loan Bank Board?—YES.

Petitioners verbally informed the applicants that the law partnership would make the necessary contribution referred to and furnish the guaranty fund required by the aforesaid provisions in the application.

On April 28, 1954, the Home Loan Bank Board gave the applicants permission to organize the "Home Federal Savings and Loan Association of Macon" (hereinafter referred to as Association), subject to compliance with specified conditions, one of which was that $20,000 of share accounts in the Association be pledged to the Home Loan Bank at Greensboro, North Carolina, as a guaranty against operating deficits and losses in excess of reserves, the pledge to remain in effect for 3 years and until the net reserves and undivided profits were at least $20,000.

The applicants submitted to the Home Loan Bank Board a proposed budget of operation for the first year which was prepared with the assistance of the supervisory agent of said Board. This budget disclosed that the Association would pay a dividend (i. e., interest) of 3 per cent on deposits from its opening date. The proposed budget also showed that the payment of dividends would result during the first year's operations in a deficit of $2,267. It was necessary, under the requirements of the Home Loan Bank Board, that the deficit be made good.

During 1953 and 1954, Federal savings and loan associations in Macon and other cities in Georgia were paying a dividend of 3 per cent per annum or better. The aforesaid directors informed prospective depositors that it was their intention that the Association would likewise pay dividends from the commencement of business at the rate of 3 per cent per annum.

The nine applicants were approved by the Home Loan Bank Board as directors of the Association. Under the rules of said Board, the term of each director was 3 years with one-third of the directors being elected each year.

Petitioners had no formal or written agreement with the board of directors assuring them that their law firm would obtain most of the business generated through loans made by the Association. Petitioners and the directors, however, had a general understanding at the time the Association was organized that the law partnership would be the attorneys for the Association. After their election and approval, the directors of the Association selected the law partnership as the attorneys for the Association.

On July 2, 1954, Martin addressed a memorandum to the secretary of the Association directing the secretary to open savings share

accounts for each of the eight charter applicants, aside from himself, in the amount of $1,500 each; and to open savings share accounts for him and Snow in the amount of $4,000 each. Three checks accompanied this memorandum drawn by petitioners, two in the amount of $9,250 each, and one drawn by T. Baldwin Martin, Jr., in the amount of $1,500. On the same date the $20,000 was deposited in the Association, George C. Grant and Hendley V. Napier (the other two partners of the law firm) executed their notes for $3,000 and $1,500, respectively, to petitioners.

At times contemporaneous with or subsequent to the opening of the aforesaid savings accounts with the Association, the aforesaid ten individuals executed formal assignments of their respective savings account passbooks in favor of the Federal Home Loan Bank of Greensboro as security for their guaranty.

On July 10, 1954, the Association commenced business. Under Federal law, every Federal savings and loan association has semiannual accounting periods ending on June 30 and December 31 of each year, and dividends to shareholders are payable as of these dates. The Association maintained its books and records on an accrual basis. The law partnership waived fees due it for the first fiscal period of the Association ending December 31, 1954. For the semiannual period ending June 30, 1955, the law firm received fees in the sum of $7,942.55. Its fees for the second fiscal year ending June 30, 1956, were $16,210.25; and for the third fiscal year ending June 30, 1957, $14,740.28. Fees received were solely for services in making abstracts and giving opinions as to titles. No other charges to the Association were made by petitioners.

As of December 31, 1954, the Association had a net operating profit of $5,561.57 by virtue of all attorneys' fees having been waived. Under the resolution of the Home Loan Bank Board, the Association was required to set aside 25 per cent of its net profits for that year, i. e., $1,309.13, as a reserve for losses. Dividends on deposits since the opening of the Association at 3 per cent per annum amounted to $7,418.82 as of December 31, 1954. After deducting the 25 per cent reserve, dividends exceeded net profits by $3,247.72. Said deficit of $3,247.72 was paid to the Association by the law partnership on December 31, 1954, petitioners' part thereof being $1,136.70 each. Petitioners paid the amounts in question individually because the other partners did not have funds available. Thereafter, pursuant to agreement with the other partners, the latter repaid their proportionate share of the obligation for such deficit to petitioners.

In 1955, the law partnership made additional contributions totaling approximately $4,000 to enable the Association to pay dividends of 3 per cent on June 30 and December 31 of that year. Since January

1, 1956, the net profits of the Association, after the deduction of 25 per cent for reserves, have been sufficient to meet the dividend requirements.

Under the rules of the Federal Home Loan Bank, the law partnership could not be reimbursed for its payment to the Association.

On January 14, 1955, the directors of the Association adopted a resolution reciting in part that the law partnership had paid into the Association on December 31, 1954, the sum of $3,247.72. Said resolution further recited:

Be it resolved that the said sum so contributed by Martin, Snow & Grant be repaid to them by the Association as soon as the Association shall be in position to pay it after providing for dividends and necessary reserves.

On March 17, 1955, the president of the Federal Home Loan Bank in Greensboro and supervisory agent of the Home Loan Bank Board sent to the board of directors of the Association a report of the examination, and in his letter of transmittal stated:

Because of your agreement with the Bank at the time you filed an application for permission to organize, we are surprised to learn of your action setting up as a contingent liability your contributions of either cash or services to be paid by the association as soon as it is in a position to do so. You will recall that in your application you agreed to contribute to the association in cash and *without liability* on the association for refund of any operating deficit after the payment of all expenses incurred, provisions for dividends, and proper allocations to reserves and undivided profits.

Although we are confident that it was not your intent to violate your agreement, we feel that your resolution of January 14 does violate it. Since it is not permissible for an association to carry such a contingent liability and in order that you may comply with your agreement with this Bank, we request that the resolution be rescinded and that a resolution be adopted which will provide that the cash and services were contributed to the association without liability on it for refund.

After you have considered the report and this letter and have taken such action as is required, please send us two certified copies of excerpts from the minutes setting forth the action taken on each point discussed.

Thereafter, in accordance with said letter, the board of directors rescinded the resolution adopted on January 14, 1955, said rescission, in part, reciting:

Be it resolved that said resolution of January 14, 1955, be and the same is hereby rescinded and set aside and that the cash and services referred to therein be considered as contributions to the Association without liability on it for refund.

OPINION.

Respondent, in his statutory notice, disallowed the deduction of $1,136.70 claimed by each of the petitioners on their joint returns for calendar year 1954 as an ordinary and necessary expense of their law practice in connection with their agreement to make good any operating deficits of a newly organized Federal savings and loan association.

Essentially, it is respondent's position that petitioners' pro rata share (70 per cent) of their payment under the agreement was not an "ordinary" expense of engaging in the practice of law; that the payments were not for the preservation of existing business income or goodwill but, rather, were in the nature of capital expenditures for the "acquisition of the control of a new business," and hence not properly deductible during the taxable year within the intendment of section 162 (a) of the Code of 1954.[1]

Petitioners, at the trial, limited their claim to the deductibility of the amounts in dispute as ordinary and necessary expenses of conducting their law practice within the purview of section 162 (a), *supra*.

At the outset, we note that engaging in the practice of a profession is the carrying on of a "trade or business" within the meaning of said statute. *Henry G. Owen*, 23 T. C. 377, 379 (1954).

It is well established that reasonable "expenditures made to protect or to promote a taxpayer's business, and which do not result in the acquisition of a capital asset, are deductible" as ordinary and necessary expenses of transacting a trade or business. *Edward J. Miller*, 37 B. T. A. 830, 832 (1938); *Ray Crowder*, 19 T. C. 329 (1952); *L. Heller & Son, Inc.*, 12 T. C. 1109 (1949); *Catholic News Publishing Co.*, 10 T. C. 73 (1948); *Scruggs-Vandervoort-Barney, Inc.*, 7 T. C. 779 (1946); *United States* v. *E. L. Bruce Co.*, 180 F. 2d 846. The rule has been applied in construing the predecessor section 23 (a) (1) of the 1939 Code and is equally applicable under the Code of 1954. The crucial and controlling factor lies in determining whether the acts done and expenditures made were motivated by a purpose to protect or to promote the taxpayer's business or were made as an investment in a new enterprise. For a comprehensive discussion of this point, and citation of authorities, see *Alleghany Corporation*, 28 T. C. 298, 303 (1957); *First National Bank of Skowhegan*, 35 B. T. A. 876 (1937). Of course, the burden is upon petitioners to establish that the expense is proximately related to their business and is both ordinary and necessary. Issues of this type primarily raise questions of fact involving "the appreciation of particular situations, at times with border-line conclusions." *Welch* v. *Helvering*, 290 U. S. 111, 116 (1933).

The statutory requirements that an expense, to be deductible, must be ordinary and necessary are, in our judgment, met by the facts in the case at bar. In the sense in which the word "necessary" has been defined as "appropriate and helpful," in our view this expenditure was necessary. The term does not mean indispensable. In our opinion, it is sufficient if there are "evident business ends to be served, and an intention to serve them appears adequately from the record." *B.*

[1] SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

*Manischewitz Co.,* 10 T. C. 1139, 1145 (1948). Likewise, the concept of "ordinary" under the Code does not require that the expenditures be either habitual or normal in the sense that the taxpayer either makes or is required to make them often. We think that the legal connotation of the word "ordinary," as defined in *Welch* v. *Helvering, supra,* includes the nurturing of a savings and loan association through infancy, under the special circumstances involved herein.

The testimony of Martin, taken in connection with all of the circumstances, satisfies us that the expenditures in question had a definite purpose proximately related to the law practice of petitioners and were reasonably calculated to accomplish the end sought. The record shows that for many years prior to 1953, the law partnership had accumulated abstracts or back titles to virtually every subdivision in Bibb County, enabling the firm to derive steady and substantial fees from making abstracts and rendering opinions to titles to realty for lenders of money with real estate as security. Respondent, on brief, acknowledges that this was a "valuable source of income to the partnership." In 1953, after this source of earnings diminished, the law firm sought to augment its fees by organizing the Association, and because petitioners and their partners anticipated all of the financial gain therefrom to inure to the benefit of their firm, they agreed to defray the expense of organizing the Association and to underwrite operating deficits (for the initial 3 years) which were anticipated until the Association was on a profitable basis. Since petitioners had a general understanding with the board of directors (all of whom were friendly to them) that their law firm would act as attorneys for the Association so long as services of the firm were satisfactory, there can be no doubt that the firm was in a favorable position to augment its income from abstract fees arising in connection with the Association's business of making loans.

It is clear that petitioners "spark-plugged" the Association with the explicit objective of promoting an additional source of legal (abstract) fees. They, of course, did not enter into the guaranty agreement for the purpose of engaging in the business of operating a savings and loan association. To look upon their obligation to pay, and actual payment of the operating deficit, as an expenditure to develop a "new business," as respondent urges, is to isolate the transaction from the overall customary practice of the firm as well as to obscure the purpose for which the payments were made. The expenditures, as above indicated, were to promote an additional source of abstract practice which, in turn, would permit a more efficient use of petitioners' valuable "abstract plant" accumulated over many years. The two factors, taken together, were clearly calculated to increase the law firm's profits from the practice of law.

Respondent, relying on *Carl Reimers Co.*, 19 T. C. 1235, 1239 (1953), affd. 211 F. 2d 66 (C. A. 2, 1954), argues that the payments were made by petitioners for the "acquisition of new business or good will" and that any benefit from their expenditure has an indefinite future duration and, hence, cannot be regarded as a current charge against income. We disagree. The facts in *Carl Reimers Co.* differ materially from those in the instant case. There, the taxpayer was expanding into a "new field" of advertising, and in order to do so successfully it was faced with the necessity of making certain nonrecurrent payments to put itself in shape to do that. The outlays there were not made, as they were in the instant case, for the purpose of protecting, retaining, or adding to the business which the taxpayer already had, but to fulfill a prerequisite to the attainment of something new.

It is true that petitioners and their law firm looked to the development of an additional source of legal fees by organizing the lending institution. By virtue of the manner in which the board of directors was selected, the firm was placed in an advantageous position to receive legal business generated by the Association, and, as expected, after several years of operation of the Association, the relationship did produce additional income to the law partnership. It is our view, however, that such factors do not of themselves require the conclusion that the payments in issue were capital in nature, as respondent contends. While capital expenditures ordinarily result in the acquisition of assets having periods of useful life in excess of 1 year, it does not follow that an expenditure must be deemed a capital outlay merely because the ultimate benefit may accrue in a year or years subsequent to the year of payment. See *International Shoe Co.*, 38 B. T. A. 81, 93 (1938), and cases therein cited.

In the instant case we recognize that the benefit derived from petitioners' relationship with the Association was not fully realized or exhausted within the taxable year. However, petitioners have not acquired any specific asset in return for their payments which made good the operating deficit of the Association. A Federal savings and loan association has no capital stock, and no individual, regardless of his contributions to the Association, may share in its income or surplus except as a member-shareholder in proportion to his or her deposit. Consequently, petitioners, by their guaranty and subsequent payments pursuant thereto, acquired no capital asset in the form of a disposable interest in a going concern. See *Camloc Fastener Co.*, 10 T. C. 1024, 1029 (1948). As we have already said, the purpose of the agreement and the payments made pursuant thereto were proximately related to the plan and purpose of providing for or promoting an additional source of legal fees in order to enhance their income from their existing law business, particularly abstract work. See discussion in *Tony*

*Martin*, 25 T. C. 94 (1955), at page 99 *et seq.*, which, while considering the issue of business versus nonbusiness bad debts rather than business expenses, reflects upon the business nature of the expenditures here involved.

Respondent urges that the instant case is controlled by *McDonald v. Commissioner*, 323 U. S. 57 (1944), and *Revere Racing Association v. Scanlon*, 232 F. 2d 816 (C. A. 1, 1956). We think that neither of these cases is here controlling. In *McDonald*, where it was held that running for public office does not constitute a trade or business within the intendment of section 23 (a) (1) (A), the Supreme Court noted that while the taxpayer (a lawyer and judge) could deduct all expenses that related to the discharge of his current functions as a judge, his campaign contributions were not "incurred in being a judge" but "in trying to be a judge for the next ten years."

In *Revere Racing Association, supra*, expenditures were made by a dog racing corporation to persuade a majority of the voters to vote in the affirmative on a question put before them as to whether a parimutuel system of betting on dog racing should be permitted in their county. Holding that the expenditures were not deductible from the corporation's gross income under section 23 (a) (1) (A), the court emphasized that the disbursements "were not the expenses of doing business in any sense of the word, but were to put the voters in a frame of mind that would give them [the corporate taxpayer] a possible opportunity to do business later." In our opinion, the facts in the case at bar are quite different from the circumstances in the cases of *McDonald* and *Revere Racing Association, supra*. See discussion referred to in *Tony Martin, supra*.

Among the authorities cited by petitioners in support of their contention that the payments in question are deductible as ordinary and necessary expenses of carrying on their law practice are *Robert Gaylord, Inc.*, 41 B. T. A. 1119 (1940), and *Charles J. Dinardo*, 22 T. C. 430 (1954). We believe the essential facts in these cases more closely resemble the factual situation before us.

In *Robert Gaylord, Inc., supra*, the taxpayer corporation, engaged in the business of manufacturing and selling shipping containers, and several other corporations, banks, and individuals likewise engaged in business in St. Louis, Missouri, signed an instrument of guaranty and deposited with one of the banks an aggregate amount of $2,000,000 to induce said bank to take over the assets and assume the liabilities of another bank which was on the verge of being closed because of its inability to withstand a silent "run" and to meet withdrawals of a million dollars per day. The deposit was made to avert the probable loss of accounts receivable and other adverse effects upon taxpayer's business which, it was felt, would follow from the closing of one of the largest banks in the community. In holding

that the expenditure was made for the protection of the taxpayer's business and deductible under the provisions of section 23 (a) (1) (A), we stated that the taxpayer, as here, was not engaged in the indemnity or guaranty business, and that the payments were made to preserve, protect, and promote its own business of manufacturing and selling containers. It may be added that the taxpayer in that case likewise had no direct financial stake in the bank.

In *Charles J. Dinardo, supra*, the taxpayers formed a partnership for the practice of medicine. They organized a nonprofit hospital in order to have available hospital facilities for their large accident and industrial injury practice. The hospital was operated as an adjunct of the medical practice of the taxpayers and medical cases could be admitted to the hospital only as patients of the taxpayers. The existence of the hospital and the taxpayers' unrestricted access to its facilities enhanced partnership income from medical fees. After organization and a period of operation, it appeared that the hospital's income would be insufficient to meet its operating expenses. Hence, an agreement was then entered into whereby the taxpayers agreed to pay the operating deficits of the hospital in order to assure its continued operation. The agreement was not limited in point of time. In allowing a deduction for payments made pursuant to said agreement under section 23 (a) (1) of the Code of 1939, we said (p. 435):

The partnership did not pay Collinwood Hospital's operating deficits to enable Collinwood to make profits from the operation of a hospital, thereby to augment the partnership income with hospital income. The payments were made to keep Collinwood in operation in order that the medical partnership itself could continue to earn medical fees from patients who would be hospitalized at Collinwood, * * *

\*     \*     \*     \*     \*     \*     \*

Respondent next maintains that the partnership's payment of Collinwood's operating deficits was not an ordinary and necessary business expense. * * *

We disagree with respondent's contentions. The facts in this case more closely resemble the situations involved in decisions which allow, as ordinary and necessary business expenses, payments made by a taxpayer to protect or preserve its business income from loss or diminution. [Cases cited.]

\*     \*     \*     \*     \*     \*     \*

These decisions, and the other cases previously cited, allow, as ordinary and necessary business expenses, expenditures made by a taxpayer seemingly on another's behalf, to prevent injury to its own business income. We think the expenditures made by petitioners' partnership to preserve the source of medical fees provided by Collinwood's existence should be accorded similar treatment.

Respondent attempts to distinguish *Dinardo, supra*, from the instant proceeding on the grounds that the doctors maintained absolute control over the operation of the hospital and later were forced to subsidize it in order to protect and preserve a valuable source of medical fees, whereas petitioners here were seeking to develop a "new source of income." The distinction, we think, is without substance. In the sense

596

in which respondent puts it, each new patient availing himself of the facilities of the hospital was a "new" or potentially "new" source of income to the doctors who organized it. We think that the essential underlying facts in *Dinardo* and in the instant case are indistinguishable. In *Dinardo*, the doctors were already practicing and merely wanted to protect and augment their practices. Similarly, petitioners' law firm had an abstract plant and sought to protect and supplement their income from legal fees by obtaining additional abstract clients. The Association (as well as the hospital) was in operation when the payments were made. In both instances, the taxpayers were, at least in some measure, economically affected by the existence of the institutional facilities which they agreed to underwrite. Thus, the doctors would not earn the medical fees from patients hospitalized at Collinwood if they didn't maintain the facilities, and the law firm would not get the abstract business of the Association if it were not in operation. The payments in both cases were made for like purposes and under like circumstances. No capital asset was acquired in either instance.

In light of the foregoing, we are of the opinion that the expenditures in question constituted ordinary and necessary expenses, and, accordingly, petitioners' contentions are sustained.

*Decisions will be entered for the petitioners.*