Jones Beach Theatre Corporation v. Commissioner.
Jones Beach Theatre Corp. v. Commissioner
Docket No. 966-64.
United States Tax Court
T.C. Memo 1966-100; 1966 Tax Ct. Memo LEXIS 181; 25 T.C.M. (CCH) 527; T.C.M. (RIA) 66100; May 17, 1966
Lawrence A. Blatte and Jules Ritholz, for the petitioner. Rudolph J. Korbel, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined a deficiency in income tax against the petitioner *182 for the fiscal year ended July 31, 1958, in the amount of $13,484.18. The only issue for decision is whether petitioner is entitled to a deduction of $29,866.38 for payments it made in satisfaction of the debts of a predecessor corporation. Findings of Fact Some of the facts have been stipulated and are so found. The Jones Beach Theatre Corporation (hereafter called petitioner) was organized under the laws of the State of New York on November 15, 1955. It filed its Federal corporation income tax returns for the fiscal years ended July 31, 1956, 1957, and 1958 with the district director of internal revenue, Brooklyn, New York. Since its incorporation the stock of petitioner has been owned equally by Guy Lombardo, Carmen Lombardo, Lebert Lombardo, and Anton Fischer (the Estate of Anton Fischer after his death in October 1957). Petitioner was formed to continue the business of a corporation known as Guy Lombardo Enterprises, Inc. (hereafter called Enterprises), which was incorporated under the laws of the State of New York on November 24, 1953, with its stock held exactly the same as that of petitioner. Guy Lombardo, leader of the famous Guy Lombardo Orchestra, was the president *183 of Enterprises, and his brothers Carmen and Lebert were its other officers. During the summers of 1954 and 1955 Enterprises produced a show called "Arabian Nights" at Jones Beach Marine Theatre (hereafter called Marine Theatre), an 8,200-seat, open-air amphitheater located at Jones Beach State Park, Nassau County, New York. Marine Theatre is unique. It was built to be the largest of its kind in the world, with two stages separated by a 100-foot waterway permitting the use of barges and boats in its productions. The rear stage is located 100 feet from the audience, requiring the proscenium (or forward opening) in the front stage to be 150 feet wide, three times that of a normal theatre. The scenery used is 60 to 70 feet high and erected permanently on a turntable 72 feet in diameter. Costumes used in the productions at Marine Theatre must be vivid and durable because of the weather conditions. The scenery has to be anchored down because of high winds. Because of weather limitations, the summer season begins on the last Thursday in June and ends the night before Labor Day, providing approximately 75 performances each year. Rain and even the forecast of it is always a problem because *184 of its effect on attendance. Performances which are cancelled because of rain cannot be rescheduled as matinees and, therefore, the lost ticket sales resulting from nonperformance cannot be recovered. The 1954 season was financially unsuccessful for Enterprises and during August 1955 several hurricanes seriously hampered activities at Marine Theatre, causing cancellation of all performances from August 9 through Labor Day. Although the Lombardo brothers took no salaries for their services during these years, Enterprises was insolvent at the end of the summer of 1955 and unable to pay its unsecured debts, totaling $29,866.38. In order to recoup their losses, the Lombardo brothers took their orchestra on the road after informing the New York authorities that they were not going to be associated with any further productions at Marine Theatre. While on the road, however, the Lombardos were contacted by the New York State officials (known as the Jones Beach State Parkway Authority and hereafter called Authority) and encouraged to continue the production of summer shows. Representatives of the Authority pointed out that Marine Theatre had a national reputation and that it was in the public *185 interest to continue the productions. Sidney M. Shapiro, general manager of the Authority, personally telephoned Guy Lombardo a number of times on his tour in an effort to persuade him to reconsider. Stanley J. Polek, director of the Authority, made a personal trip to Las Vegas, Nevada, to persuade the Lombardos to produce a show for the 1956 season. In answer to these requests the Lombardos pointed out that they had alreay suffered substantial personal losses in connection with their guaranties of some of Enterprises' debts during the 1955 season, and that because of the remaining unpaid bills they could not deal with the same trade, advertising, and stage people. Furthermore, the Lombardos did not want to take the financial risk of bad weather. In order to induce the Lombardos to produce a show for the 1956 season, the Authority offered them an advance payment of $200,000 with the understanding that the Lombardos would pay the $29,866.38 of bills incurred and left unpaid by Enterprises as a result of the 1955 production. Thus the $200,000 was to be used not only for preproduction expenses for a new show but also to help the petitioner wipe the slate clean on the 1955 show. It *186 is the overall policy of both the Authority and its parent organization, the Long Island State Park Commission, to avoid insolvencies and defaults on legitimate obligations connected with Authority ventures. The Authority deems it important to maintain a good public image and credit rating, and to avoid any unfavorable publicity which might reflect on the Authority and its parent organization. Since the Authority and its parent organization borrow large sums of money from public sources, a good credit rating is important to maintain low interest and borrowing costs. The Authority therefore considered it unwise to make the advance to Enterprise and wanted to deal with a corporation that was free of debt. For this reason the petitioner was organized. The Authority has an established policy featuring a two-year cycle for the shows presented at the Marine Theatre. A particular show is produced in one year and repeated in the second year. This policy prevailed during the 1952 and 1953 seasons when Mike Todd was the producer, and for the 1954 and 1955 seasons when Enterprises produced "Arabian Nights." It also prevailed during the years 1956 and 1957 when petitioner produced "Show Boat. *187 " In the entire history of Marine Theatre no show has ever been repeated a third year. The musical play "Show Boat" is based upon a novel by Edna Ferber, with music by Jerome Kern and book and lyrics by Oscar Hammerstein. Petitioner presented "Show Boat" during the summer seasons of 1956 and 1957, pursuant to a lease from the author, without acquiring any ownership rights therein. These remained in the author. Petitioner acquired only so-called performance rights. Consequently, orchestrations or adaptations of the show prepared by its performers became the property of the owners. For the 1956 season the petitioner constructed special scenery, including a big show boat 110 feet long. The scenery was tailor made and unsuitable for use at any other theatre. The orchestrations supplied by the owners were inadequate, so petitioner had to enlarge the orchestrations for a 40-piece orchestra. By the close of the 1956 summer season the petitioner knew it would repeat the show for the 1957 summer season. The scenery was tied down with ropes and anchored in place, the show boat was covered and protected with paper to keep snow and ice out of it, and the costumes were sent to the dry cleaners *188 for restoration and storage. The orchestrations were stored away, and the owners of "Show Boat" and the costume rental company were notified that petitioner would repeat the show the following season. Petitioner gave notice to the cast and other personnel that the show would be repeated and that they would have first preference for the next year. The repeat of "Show Boat" for the 1957 season closed Labor Day of 1957. There was never any consideration given to running the show for a third season. The orchestrations which were prepared by petitioner at its own expense were delivered to the owners of "Show Boat" and they were notified that petitioner no longer desired performance rights in the show. The costumes were returned to the rental agency, the scenery discarded, and the show boat dismantled. The scenery and playbill designs, along with the choregraphy numbers, were discarded. Petitioner has not received any income from any source subsequent to the close of "Show Boat" in the summer of 1957. Petitioner was incorporated to meet the request of the Authority for a "new corporation" free from debt to receive the $200,000 advance payment. It was organized on the same day the "Show *189 Boat" contract was signed, and it has not conducted any business since it produced "Show Boat." The Lombardo brothers did not produce a show at Marine Theatre during the summers of 1958 and 1959. In 1960, however, they produced a show entitled "Hit the Deck" through their corporation, G.C.L. Productions. During the summer seasons of 1961 and 1962 G.C.L. produced a show entitled "Paradise Island." Since then G.C.L. has produced two other shows, "Around the World in 80 Days" and "Mardi Gras," the latter in the summer of 1965. The contracts between Enterprises and the Authority for the 1954 and 1955 summer seasons were negotiated on the basis of a hypothetical break-even point of $750,000, the producer retaining the first $750,000 of ticket sales and thereafter sharing them one-half to the producer and one-half to the Authority. The contract for the 1956 summer season with petitioner differed substantially from the contracts for the 1954 and 1955 shows. In 1956 the Authority paid $200,000 to the petitioner as an advance. In addition, the petitioner was to retain the first $500,000 in ticket sales; ticket sales between $500,000 and $800,000 were to be shared one-third by petitioner *190 and two-thirds by the Authority. The excess over $800,000 in ticket sales was to be shared one-half by petitioner and one-half by the Authority. In 1957 the Authority paid $100,000 to petitioner as an advance towards the second season of "Show Boat." As in 1956, petitioner was to retain the first $500,000 in ticket sales. However, unlike 1956, the next $100,000 in ticket sales (between $500,000 and $600,000) was to be paid to the Authority. The petitioner was to retain ticket sales between $600,000 and $750,000. Ticket sales in excess of $750,000 (the estimated break-even point) were to be shared one-half by petitioner and one-half by the Authority. Petitioner paid the bills incurred by Enterprises for the 1955 season, totaling $29,866.38, as follows: (a) Between the period 1-10-56 and
6-29-56 (fiscal year ending July
31, 1956)
$11,199.39
(b) Between the period 8-8-56 and
6-28-57 (fiscal year ending July
31, 1957)
18,666.99 The total amount of $29,866.38 was deducted on petitioner's income tax return for its fiscal year ended July 31, 1958. The Authority advanced $200,000 to the petitioner in 1956 with the intention of getting it back should that season *191 be successful and the petitioner fulfilled this obligation by paying back the entire $200,000 in accordance with the terms of the contract. The parties had no way of knowing whether "Show Boat" would run one or two years, so the contracts between petitioner and the Authority for its production during the summers of 1956 and 1957 were negotiated for separately. There was no contractual obligation at any time between the petitioner and the Authority which required the petitioner to pay the unpaid debts of Enterprises. Petitioner has never been liquidated and up to the time of trial continued to show assets and liabilities on its balance sheets. The amounts in issue were spent in establishing petitioner as a producer of theatrical shows. Opinion The first contention of petitioner is that $29,866.38, covering the debts of Enterprises, is deductible because it was paid at the "insistence" of the Authority. We think this makes no difference. The deductibility of these debts has nothing whatever to do with the degree of business necessity which lay behind their payment. No doubt the Authority advanced petitioner sufficient funds to set up its 1956 production with the understanding *192 that such debts would be paid. And, while the contract created no legal obligation on petitioner to pay the unsecured creditors of Enterprises, we are satisfied that both parties intended this to be done. We have reached this conclusion even though, as it turned out, petitioner did not pay these debts immediately upon receipt of the $200,000 advance from the Authority. Instead it spread the payments over its first 2 fiscal years. Such a leisurely pace hardly coincides with the petitioner's argument that the Authority insisted upon and required prompt payment. Petitioner has repeatedly characterized the $200,000 advance as "non-returnable." We view this as an attempt to create the impression that the petitioner merely paid the debts of Enterprises at the direction and with the funds of the Authority. But that is simply not what happened. The debts were paid over a period of time, including the second season production of "Show Boat" which carried its own $100,000 advance from the Authority. Furthermore, the evidence shows that the first season produced sufficient receipts to return the entire $200,000 to the Authority as the contract required. The fact that the break-even point was *193 raised in 1956 to provide for a complete recoupment of petitioner's expenses plus a sum sufficient to repay it for satisfying the debts of Enterprises before returning the advance to the Authority does not compel the conclusion that the Authority provided the funds for paying the debts where the entire advance was returned to the Authority. The petitioner unquestionably bore the burden of paying the debts. That it did so and thus relieved the Authority from the possible loss of a portion of its $200,000 advance was due to the success of the 1956 season, and not to any desire of the parties to use public funds for the payment of such debts. Hence, the "insistence" of the Authority that petitioner pay the debts of Enterprises does not establish the deductibility of payments by petitioner under any provision of the Internal Revenue Code with which we are familiar. Nor has the petitioner referred us to any statutory provisions supporting its theory. The argument strikes us as being essentially an equitable one, i.e., since petitioner has been forced to take into income the funds which it used to pay Enterprises' debts, it should be entitled to a corresponding deduction. The argument has *194 no legal foundation and is therefore not persuasive. In the alternative the petitioner contends that, even if the Authority did not insist upon the payment of Enterprises' debts their payment by petitioner was an ordinary and necessary business expense [1] since the 1956 production could not have taken place without their payment. Here again we emphasize that these debts were not fully paid prior to the 1956 summer season, but were paid in part during the period which ended June 28, 1957. But, irrespective of this fact, the facts in this record are substantially similar to those in Welch v. Helvering, 290 U.S. 111 (1933). In that case the taxpayer paid the claims of former customers of a bankrupt corporation of which he had been an officer in order to strengthen his individual standing and credit and to reestablish business relations with the corporation's former customers. The Supreme Court held that the expenditures were not deductible as the ordinary and necessary business expenses of Welch. Likewise, the payments in this case were made to establish the individual standing and credit of petitioner and to reestablish business relations with the former service people *195 of Enterprises. The rationale of Welch v. Helvering, supra, is controlling. Moreover, the facts in Carl Reimers Co., 19 T.C. 1235 (1953), affd. 211 F. 2d 66 (C.A. 2, 1954), are also close to the facts before us here. In that case it was held that the payment of a bankrupt corporation's debts by a second corporation succeeding to the business did not constitute an ordinary and necessary expense of the second corporation when the payment was made merely to permit it to deal with the first corporation's creditors. Reliance on such cases as Edward J. Miller, 37 B.T.A. 830 (1938); Scruggs-Vandervoort-Barney, Inc., 7 T.C. 779 (1946); Cubbedge Snow, 31 T.C. 585 (1958), does not aid the petitioner. Such cases, and others cited by petitioner to the same effect, are distinguishable because they involve expenditures made to retain, promote, or protect an established business rather than establishing a new one. As we said in Cubbedge Snow, supra at p. 591: It is well established that reasonable "expenditures made to protect or to promote a taxpayer's business, and which do not result in the acquisition *196 of a capital asset, are deductible" as ordinary and necessary expenses of transacting a trade or business. Edward J. Miller, 37 B.T.A. 830, 832 (1938); Ray Crowder, 19 T.C. 329 (1952); L. Heller & Son, Inc., 12 T.C. 1109 (1949); Catholic News Publishing Co., 10 T.C. 73 (1948); Scruggs-Vandervoort-Barney, Inc., 7 T.C. 779 (1946); United States v. E. L. Bruce Co., 180 F. 2d 846. The rule has been applied in construing the predecessor section 23(a)(1) of the 1939 Code and is equally applicable under the Code of 1954. The crucial and controlling factor lies in determining whether the acts done and expenditures made were motivated by a purpose to protect or to promote the taxpayer's business or were made as an investment in a new enterprise. Since the production of "Show Boat" in the summer of 1956 was the first business activity of petitioner, we view the payment by it of Enterprises' *197 debts as connected with the establishment of a new enterprise. Consequently, the amounts paid were capital expenditures and not ordinary and necessary business expenses. Petitioner purchased access to various theatrical suppliers whose goods and services undoubtedly would have not been available to it had the debts of Enterprises remained outstanding. Access to essential tradespeople is an intangible capital asset in the nature of goodwill. Having found that the payment of the debts in question created an intangible capital asset, we consider now two alternative arguments advanced by petitioner. First, it is argued that the facts of this case bring it within the provisions of section 1.167(a)-3, Income Tax Regs.[2] While we agree that intangibles with definite and ascertainable useful lives may be amortized under the regulations, the petitioner has failed to prove that the asset here involved has a limited useful life. This burden is not satisfied simply by asserting, as petitioner does on brief, that its "sole business purpose was to present "Show Boat" for two consecutive summer seasons," thus giving the payments "a business use limited by two years, *198 namely, 1956 and 1957." Petitioner confuses the life of "Show Boat" with its own life. "Show Boat" may have been produced for 2 years but the petitioner's life extended far beyond that production. In fact, up until the trial of this case, petitioner continued to show assets and liabilities on its balance sheet. The record establishes that the Lombardos hoped for a 2-year production of a particular show but negotiated for each year separately. The record also establishes that several shows were produced by the Lombardos through their G.C.L. corporation. There is nothing to indicate that the petitioner could not have been utilized for the production of one show two, shows, or ten shows, the same way G.C.L. was utilized. *199 Finally, and again alternatively, the petitioner contends that it is entitled to an abandonment loss [3] in its taxable year ended July 31, 1958, because by that time it had disposed of all its assets and had ceased doing business. The trouble with this contention is that the petitioner has not abandoned this asset at all. It has not been used because the petitioner has chosen not to produce any further theatrical productions. If petitioner should reactivate itself tomorrow by preparing a new production, the usefulness of this asset would be as real and substantial as it was during the years in issue. Therefore, to allow a loss to petitioner on this theory would run contrary to the regulations. [4]
*200 It is well settled that mere nonuse of an asset does not constitute an abandonment loss in the absence of a permanent disposition of the asset. W. B. Davis and Son, Inc., 5 T.C. 1195 (1945); United California Bank, 41 T.C. 437 (1964) affirmed per curiam, 340 F. 2d 320 (C.A. 9, 1965); Ersel H. Beus, 28 T.C. 1133, 1139 (1957), affd. 261 F. 2d 176 (C.A. 9, 1958); Blum v. Commissioner, 133 F. 2d 447 (C.A. 2, 1943); and Citizens Bank of Weston, 28 T.C. 717 (1957), affd. 252 F. 2d 425 (C.A. 4, 1958). The asset acquired by paying the debts of Enterprises is an inextricable part of petitioner's corporate existence and was not abandoned during any of the years in issue. Decision will be entered for the respondent. Footnotes
1. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *.↩
2. § 1.167(a)-3 Intangibles. If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill.↩
3. Sec. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. ↩
4. Sec. 1.165-2, Income Tax Regs.
Obsolescence of nondepreciable property. - (a) Allowance of deduction. A loss incurred in a business or in a transaction entered into for profit and arising from the sudden termination of the usefulness in such business or transaction of any nondepreciable property, in a case where such business or transaction is discontinued or where such property is permanently discarded from use therein, shall be allowed as a deduction under section 165(a) for the taxable year in which the loss is actually sustained. For this purpose, the taxable year in which the loss is sustained is not necessarily the taxable year in which the overt act of abandonment, or the loss of title to the property, occurs.↩