M. L. EAKES COMPANY, INC., formerly MARION L. EAKES COMPANY INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
M. L. Eakes Co. v. Commissioner
Docket Nos. 10981-77, 8342-78.
United States Tax Court
T.C. Memo 1981-429; 1981 Tax Ct. Memo LEXIS 315; 42 T.C.M. (CCH) 658; T.C.M. (RIA) 81429; August 13, 1981. *315 In order to improve its credit petitioner paid the residual debts of a related corporation which had previously been liquidated by creditors. Held, the payments were an ordinary and necessary expense incurred in the conduct of petitioner's business. E.R. Zane, Daniel W. Fouts and Paul H. Livingston Jr., for the petitioner. Eric B. Jorgenson, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies in petitioner's income tax as follows: Taxable
Docket No.
Year Ended
Deficiency
10981-77
6/30/73
$ 8,866
6/30/74
4,066
6/30/75
14,477
8342-78
6/30/77
15,266
*316 The cases have been consolidated for trial, briefing and opinion. The sole issue for decision is whether petitioner can deduct, under section 162, [1] payments made to trade creditors of a previously liquidated related corporation. FINDINGS OF FACT Some of the facts have been stipulated by the parties and are found accordingly. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner is a corporation incorporated under the laws of the State of North Carolina. Petitioner filed its Federal income tax returns for the above years at the Internal Revenue Service Center in Memphis, Tennessee, using the accrual method of accounting. Petitioner was incorporated in 1959 under the name Marion Enterprises, Inc. From the time of petitioner's incorporation until August 1970, petitioner's sole activity was to own certain real property which petitioner rented to M.L. Eakes, Inc. (hereafter MLE). Mary W. Eakes (hereafter Mary) owned all of the outstanding stock of the petitioner. On December 30, 1970, she *317 transferred 50 percent of the outstanding stock to her husband, Marion L. Eakes (hereafter Marion). MLE was incorporated under the laws of the State of North Carolina in 1957. From 1957 to 1970, MLE engaged in the business of industrial air-conditioning, contracting and sheet metal fabrication. Until 1969, Marion and Mary owned all of the outstanding stock of MLE. Marion was the president and chief operating officer of both MLE and petitioner. MLE's activities were concentrated in North Carolina, Virginia and South Carolina. MLE also did business in Maryland, Georgia, Tennessee, Alabama, and Mississippi. The success of MLE depended largely on the abilities and reputation of Marion. In 1945, Marion began work for one of the major industrial air-conditioning contracting and engineering firms in the United States. By working closely with the firm's principals, Marion developed an expertise in industrial air-conditioning. From 1954 to 1957, Marion was president and chief executive officer of conditioned Air, another major industrial air-conditioning firm. In 1957, Marion left Conditioned Air and formed MLE. Beginning in 1968 MLE suffered repeated financial setbacks. In *318 1969, in order to ease MLE's problems, petitioner reduced the annual rent paid by MLE and invested $ 175,000 in MLE. In return, petitioner received 1,750 shares of $ 100 par valued preferred stock of MLE. Despite the aid of petitioner, MLE was unable to meet its obligations to trade creditors. In February 1970, MLE made a voluntary assignment of its assets for the benefit of its creditors. The creditors formed a committee and elected to liquidate MLE and distribute the liquidation proceeds pro rata. The pro rata share distributed averaged 63 cents for each dollar owed by MLE. MLE made its final cash distribution to the creditors in 1971 and a certificate of completed liquidation was filed with the North Carolina Secretary of State in February 1972. Approximately $ 110,000 owed by MLE remained unpaid. Petitioner received nothing in exchange for its 1,750 shares of preferred stock of MLE. Because MLE ceased paying rent, petitioner could no longer afford the mortgage payments on the realty and in August 1970 petitioner sold its realty. From March 7, 1970 until December 1, 1970, Marion operated the business of industrial air-conditiong, contracting, and sheet metal fabrication *319 as a sole proprietorship. Marion finished some of the uncompleted work of MLE and began to take on other contracts. However, Marion's suppliers had also been creditors of MLE and were reluctant to extend credit to the proprietorship. Marion decided to repay the creditors in order to improve his credit and began to make verbal commitments in May and June 1970 to pay the residual debts of MLE. Suppliers in petitioner's business community generally required such a commitment to be made before they would extend credit to the principal of a previously failed enterprise. A few of MLE's creditors extended credit to the proprietorship based on Marion's promise to repay MLE's debts, some creditors extended credit after payments began and others extended credit only after their accounts were paid in full. On December 1, 1970, all the assets and liabilities of the proprietorship were transferred to petitioner in exchange for petitioner's note in the amount of $ 31,652.67. Petitioner's name was changed from Marion Enterpises, Inc. to Marion L. Eakes Company, Inc. shortly thereafter. On April 25, 1977 petitioner's name was changed to M.L. Eakes Company, Inc. Petitioner has continued *320 to conduct the business of MLE and the proprietorship from December 1, 1970. The business is in the same line and in the same geographical area as was MLE and the proprietorship. In order for petitioner to do business in Virginia, it had to obtain a license from the Virginia Registration Board for Contractors. Without a commitment to pay the residual debts of MLE, petitioner would not have been granted this license. Pursuant to Marion's promises, petitioner made payments to trade creditors of MLE in the following years and amounts: Taxable
Year Ended
Amount
June 30, 1971
$ 3,546.00
June 30, 1972
15,088.97
June 30, 1973
18,471.32
June 30, 1974
8,469.37
June 30, 1975
30,160.91
June 30, 1977
31,805.00
Total
$ 107,541.57
Petitioner deducted these payments as part of cost of goods sold in all of the years involved, except the taxable year ended June 30, 1974, when the payments were deducted as moving expenses. Respondent audited petitioner's returns for the taxable years ended June 30, 1973, June 30, 1974, June 30, 1975, and June 30, 1977 and in two notices of deficiency dated September 13, 1977, and June 21, 1978, respectively, disallowed petitioner's *321 deductions for payments of the indebtedness of MLE. OPINION Petitioner seeks to deduct under section 162[2] payments made to trade creditors of a related corporation which had previously been liquidated by a committee of creditors. Respondent contends that petitioner's payments were neither necessary nor ordinary, but rather were capital expenditures akin to good will. Respondent first argues that the payments were not necessary in order for petitioner to obtain credit from its suppliers. Respondent contends that petitioner could have procured its supplies on credit either by obtaining the personal guarantee of Marion (petitioner's president) or by obtaining the guarantee of petitioner's customers for whom the materials would eventually be used. Alternatively, respondent contends that petitioner had a sufficient amount of cash on hand to make the use of credit *322 unnecessary in the operation of petitioner's business. Respondent's position is mistaken. "Necessary", as used in section 162, does not mean indispensable. In Welch v. Helvering, 290 U.S. 111 (1933), relied on by both petitioner and respondent, the court assumed that payments made to the creditors of a bankrupt company were necessary because they were "appropriate and helpful." 290 U.S. at 113. Petitioner's president and a former treasurer both testified that credit was needed to conduct petitioner's operations profitably. Surely the extension of credit by a business' suppliers is appropriate and helpful to that business. Accordingly, we hold that the payments in question were necessary. [3]
Respondent contends that the payments made were *323 not ordinary. He argues that the payments were unusual, were made in the acquisition of a capital asset similar to good will, [4] and were made to establish a new business rather than to promote or protect an existing business. Respondent relies on Welch v. Helvering, supra, and argues that the payments in question were uncommon, unusual and extraordinary. In Welch the former secretary of a bankrupt grain business later became a commission agent for another company. The taxpayer agreed to pay the debts of the bankrupt business in order to reestablish his relations with customers and to solidify his credit and standing. In discussing the meaning of "ordinary" the court stated, 290 U.S. at 114: Ordinary in this context does not mean that the payments must be habitual or normal in the sense that the same taxpayer will have to make them often. A lawsuit affecting the safety *324 of a business may happen once in a lifetime. The counsel fees may be so heavy that repetition is unlikely. None the less, the expense is an ordinary one because we know from experience that payments for such a purpose, whether the amount is large or small, are the common and accepted means of defense against attack. Cf. Kornhauser v. United States, 276 U.S. 145. The situation is unique in the life of the individual affected, but not in the life of the group, the community, of which he is a part. At such times there are norms of conduct that help to stabilize our judgment, and make it certain and objective. The instance is not erratic, but is brought within a known type. The court held that the taxpayer's payment of the debt of another was not ordinary. Respondent has read Welch to establish a general rule of law that the payment of the obligation of another is not an ordinary expense. Respondent is in error. Welch involved a failure of the taxpayer to prove that his payments were ordinary. The Court did not hold as a matter of law that such expenditures were not ordinary, but rather that "Life in all its fullness must supply the answer to the riddle. *325 " 290 U.S. at 115. Case law before and after Welch has allowed a taxpayer to deduct, as an ordinary and necessary expense, similar expenditures. A. Harris & Co. v. Lucas, 48 F.2d 187 (5th Cir. 1931), revg. 16 B.T.A. 705 (1929) (payment of previously discharged obligations was made in order to obtain credit); Scruggs-Vandervoort-Barney, Inc. v. Commissioner, 7 T.C. 779 (1946) (payments made by department store to depositors of a failed bank which had been operated by the department store's predecessor); Miller v. Commissioner, 37 B.T.A. 830 (1938) (payments by independent insurance broker to claimants of bankrupt insurance company); L. Heller and Son, Inc. v. Commissioner, 12 T.C. 1109 (1949) (payments by jeweler to creditors of bankrupt subsidiary in order to improve credit-rating); Snow v. Commissioner, 31 T.C. 585 (1958) (payments by law partnership to support a savings and loan association which generated legal fees); Lutz v. Commissioner, 282 F.2d 614 (5th Cir. 1960) (payments by a produce broker to creditors of three related corporations); *326 United States v. E.L. Bruce Co., 180 F.2d 846 (6th Cir. 1950) (payments made by a licensee to satisfy obligations of a prior licensee as a condition to obtaining both a state contractor's license and a franchise license). The meaning of "ordinary," as set forth in Welch, is whether the expense is "within a known type" in the community of which petitioner is a part, 290 U.S. at 114. Lilly v. Commissioner, 343 U.S. 90 (1952); Deputy v. DuPont, 308 U.S. 488 (1940). Norman G. Ridenhour, Treasurer and Controller of Carolina Steel Corporation since 1950, testified that while the voluntary payment of the debts of a liquidated corporation does not happen often, it has occurred several times over the years. Donald J. Brady, District Manager for the Trane Co. (manufacturer of air-conditioning equipment) for the Greensboro area for 18 years, testified that while bankruptcies and liquidations were uncommon, voluntary commitments to pay the debts of the liquidated corporation were common. Lonnie K. Thompson, Senior Vice-President *327 and Treasurer of the Dillard Paper Co. for forty-two years, testified that several instances similar to petitioner's had occurred in his experience. Henry T. Rogers, Treasurer and General Credit Manager of J.M. Tull Industries, Inc. for twenty-three years, recalled at least a dozen similar instances. Additionally, these and other suppliers in the Greensboro area have established procedures for deciding on credit requests under circumstances similar or identical to petitioner's, i.e. small businesses in which the principal involved had previously had debts discharged in bankruptcy or liquidation. The established policy of suppliers was to require a commitment identical to those made by Marion. Petitioner's payment of the debts of MLE was thus an ordinary occurrence in the business community to which petitioner belongs. Respondent contends that petitioner's payments of the residual debts of MLE were made to establish a new business and thus are nondeductible capital expenditures in the nature of good will. Petitioner argues that its payments were made to protect and promote an existing business and thus are ordinary expenses. We agree with petitioner. Respondent bases his argument *328 on Welch v. Helvering, supra; Carl Reimers Co. v. Commissioner, 211 F.2d 66 (2d. Cir. 1954), affg. 19 T.C. 1235 (1953); Burke Golf Equipment Corp. v. United States, 193 F. Supp. 615 (N.D. Ill. 1961). Welch involved payments made by a commission grain agent to reestablish relations with prospective customers and to strengthen credit and standing. The taxpayer had previously served as the secretary of a corporation involved in the grain business which had been discharged from its debts in bankrupct. The court, in holding for the respondent, did not establish a rule of law that such payments were always nondeductible. Actually Welch stated quite clearly that the issue presented in the case at bar was subject to resolution based on the instant factual situation, 290 U.S. at 116. Subsequent to Welch, the touchstone of deductibility in this context has been whether the payments were made to protect an existing business or to establish a new business. Carl Reimers Co. v. Commissioner, supra, involved a radio and magazine advertising agency which paid its president's *329 share of the residual debts of another advertising agency that had been liquidated in bankruptcy some 13 years earlier. Mr. Reimers and his wife had conducted the business as a partnership during the 13-year interval between liquidation of the first corporation and formation of the second corporation. Payment of the discharged debts was made as a condition to the taxpayer receiving "recognition" (credit and commissions) from an association of newspaper publishers. The Second Circuit held that the payments were made to expand into a new line of advertising (newspaper advertising) and held them to be nondeductible. As in Welch, payments were made to develop customers in a new enterprise. In Burke Golf Equipment Corp. v. United States, supra, payments were made to certain creditors of a bankrupt predecessor in order to assure adequate supplies. The District Court merely applied Welch as a rule of law in holding the expenditures nondeductible without providing the pertinent facts. [5]
*330 Nor is the line of authority relied on by petitioner dispositive of the issue.Petitioner's cited cases all involve similar payments made by individuals or corporations that had continuously operated one line of business for a substantial period of time. A. Harris & Co. v. Lucas, supra; Miller v. Commissioner, supra; Scruggs-Vandervoort-Barney, Inc. v. Commissioner, supra; L. Heller and Son, Inc. v. Commissioner, supra; Snow v. Commissioner, supra; Lutz v. Commissioner, supra.[6] The activities of petitioner were conducted over a substantial period, but in different business forms (by MLE, by the proprietorship and by petitioner). We are, however, convinced that the payments in the instant case were made to promote and protect an existing business. The industrial air-conditioning, contracting and sheet metal fabrication activities of petitioner have been continuously conducted *331 by Marion L. Eakes, either in corporate form or as a proprietorship, in the same geographic area since 1957. While Carl Reimers Co. involved an advertising business conducted by a corporation, then by a partnership, and then by a second corporation, all controlled by the same individual (similar to the case at bar), the distinguishing factor is that the second corporation in Carl Reimers Co. sought to deduct payments made to enter into a business activity which had never before been conducted by it. Petitioner had continued the activities of MLE and the proprietorship well before the payments in issue were made. Arguably petitioner, formerly a real estate holding company, was itself engaged in a new business when it purchased the proprietorship in 1970. However, by the time the payments in issue were made (taxable years ended June 30, 1973, 1974, 1975, and 1977), petitioner had established itself in the industrial air-conditioning, contracting and sheet metal fabrication business. Accordingly, we hold that petitioner made the payments at issue in order to protect and promote an existing business and not to establish a new business. [7]
*332 Decisions will be entered for petitioner. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the taxable years in issue.↩
2. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *.↩
3. Respondent also contends that it was not necessary for petitioner to do business in Virginia. This contention is patently erroneous. To say the least, it seems unbecoming of respondent to determine that Virginia, which was one of three states where the businesses had been concentrated, should be written off.↩
4. Because good will is an intangible asset with no determinable useful life, good will cannot be amortized, section 1.167(a)-3, Income Tax Regs.↩
5. Respondent has also cited Jones Beach Theatre Corp. v. Commissioner, T.C. Memo. 1966-100↩ in which a newly organized theatrical production company paid the debts of a bankrupt predecessor in order to produce its first show. We held the expenses to be capital because they were essential to the first business activity of the corporation. Clearly the payments at bar were not related to the first business activity of petitioner.
6. Petitioner also refers to H. Hamburger Co. v. Commissioner, a Memorandum Opinion of this Court dated August 30, 1949 and Conley v. Commissioner, T.C. Memo. 1977-406↩.
7. While petitioner's payments were also made to obtain a license from the Virginia Registration Board for contractors, neither petitioner nor respondent had argued or briefed whether such an expense is capital in nature. No evidence was presented as to the duration of the Virginia contractor's license. Under these circumstances, we agree with United States v. E.L. Bruce Co., 180 F.2d 846↩ (6th cir. 1950), in which the taxpayer satisfied the obligations of a prior licensee in order to obtain both its franchise license and a contractor's license from the State of California. The Sixth Circuit held the payments to be ordinary and necssary without comment on the duration of the state contractor's license.