HAROLD L. and TEMPLE M. JENKINS, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jenkins v. Commissioner
Docket No. 3354-79.
United States Tax Court
T.C. Memo 1983-667; 1983 Tax Ct. Memo LEXIS 121; 47 T.C.M. (CCH) 238; T.C.M. (RIA) 83667; November 3, 1983. *121 Petitioner, a/k/a Conway Twitty, made certain payments to investors in a defunct restaurant business known as "Twitty Burger, Inc." during the taxable years in issue. Held, the payments are deductible under section 162 as ordinary and necessary business expenses of petitioner's business as a country music performer. Theodore L. Jones,William G. Whatley and Alva C. Smith, Jr. for the petitioners. Charles W. Kite, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined *122 deficiencies of $67,141 and $14,226 in petitioners' Federal income taxes for their 1973 and 1974 taxable years, respectively. After concessions by petitioners and respondent, [1] the sole issue for our decision is whether certain payments made by petitioner-husband to investors in a defunct restaurant business known as "Twitty Burger, Inc.," are deductible as ordinary and necessary business expenses of petitioner-husband's business as a country music performer. *123 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts, the supplemental stipulation of facts, and the second supplemental stipulation of facts and the exhibits attached to the stipulations are incorporated herein by this reference. Petitioner Harold L. Jenkins timely filed his unmarried head of household Federal income tax return for his taxable year ending December 31, 1973, with the Director of the Internal Revenue Service Center in Austin, Texas. Petitioners Harold L. and Temple M. Jenkins timely filed a joint Federal income tax return for their taxable year ending December 31, 1974, also with the Director of the Internal Revenue Service Center in Austin, Texas. At the time the petition in this proceeding was filed, the petitioners resided in Sumner County, Tennessee. [2]
Petitioner is a country music entertainer who for more than 25 years has been more commonly known and *124 referred to by his stage name "Conway Twitty." We will hereinafter refer to him by this name. Since 1964, Conway Twitty has used a logo in connection with his work as an entertainer and in connection with his stage name. The insignia consists of an image of a small yellow bird (i.e., the Twitty Bird) strumming a guitar. During the early period of his career in the mid-1950s, Conway Twitty performed music that would be referred to in music vernacular as "rock and roll" or "pop." While living in Oklahoma in 1965, Conway decided to change his style of music to "country music." At the time of his cross-over to country music, his popularity was concentrated primarily in Texas, Oklahoma, and Arkansas. However, Conway was not a complete unknown in the country music field in 1965 as his hit recording of "It's Only Make Believe" had been a Number 1 song on the "pop charts" and the "country music charts" in 1958. [3]
By 1968, Conway Twitty was firmly rooted in the country music entertainment field. For the 10-year period from January 1968 through December 1977, every *125 title release by Conway Twitty became a Number 1 hit. By mid-1970, considering all popularity charts together, Conway Twitty had earned 43 Number 1 positions for his recordings. [4] He also boasted, in the same period, the largest fan club of any country music entertainer (i.e., over 10,000 members). Most of Conway Twitty's income comes from live performances and from songwriting and record royalties. Shortly after Conway Twitty crossed over to the country music field, he signed a contract to make records for MCA Records (formerly Decca Records). Conway has had recording contracts with Decca that were executed in 1965, 1970, 1975, and 1979. The agreements for 1975 and 1979 were revisions of the 1970 contract which initially extended for 10 years. The revisions to the 1970 contract gave him a greater percentage of the royalties because he was doing very well and was selling many records. Conway Twitty's record sales did not decline during that period *126 that he was under contract with MCA. In 1968, Conway Twitty and several of his friends decided to form a restaurant business. In late 1968, Twitty Burger, Inc. (hereinafter referred to as "Twitty Burger"), an Oklahoma corporation, was formed to operate and sell franchises for the operation of Twitty Burger Fast Food Restaurants. A number of Twitty's friends, acquaintances, and business associates were solicited to invest in Twitty Burger. In late 1968 and early 1969, approximately 75 of petitioner's friends and business associates invested money in Twitty Burger by directly remitting a check to Twitty Burger or by sending a check to petitioner on behalf of Twitty Burger, or by sending checks or other money instruments to others in petitioner's employ. Initially, it was Twitty Burger's intention to make a public offering of its stock once the securities registration requirements were met and an exemption obtained from the Securities and Exchange Commission. At the time the public offering was to be made, the investors would receive the appropriate number of shares of capital stock based upon the amount of their investment in Twitty Burger. In late 1968, when funds began coming *127 in from various individuals, petitioner hired Hugh Carden, a long-time friend, to be general manager of the Twitty Burger enterprise. At that point no restaurant had been opened. [5]
Subsequent to the time the funds were remitted by the investors, it was determined that it might be some time before all the registration requirements for a public offering of Twitty Burger stock could be met. Therefore, it was decided that debentures should be issued to the investors as interim evidence of their investment in Twitty Burger. During 1970, debentures of Twitty Burger were issued to the following investors evidencing their investment in Twitty Burger as follows: Name
Debenture No.
Face Amount
Anthony Chiodi
12
$9,222.00
Bob Neal
18
2,809.00
Don Davis
26
2,650.00
Harlan Howard
27
2,650.00
Bob Neal
30
560.00
Harlan Core
32
1,000.00
Frank Smart
34
2,809.00
Robert F. Smart
35
3,371.00
Scott Smart
36
2,809.00
Michael Bennett
49
2,787.50
Dale Ferguson
56
550.00
Robert Hurley
60
1,110.00
G. W. Shuck
68
223.00
Billy C. Trousdale
71
3,345.00
John Weatherford
73
557.50
Les Chapmand and/or
Louise Chapman
78
1,111.00
Earl Merrick
79
2,816.25
Earl T. Merrick
80
2,816.25
Catherine Merrick
81
5,632.50
E. H. Wilemon and/or
Christine Wilemon
47
2,198.00
Roger Cleghorne
54
560.00
M. L. Clifton
58
106.00
Graham Kendall
61
1,110.00
Bobby Pugh and/or
Sherry Pugh
43
225.00
Sonny Neal
29
500.00
Shirley Legate
28
106.00
Gary Lake
8
2,809.00
Virginia Jones
6
2,809.00
Roger Mills and/or
Ethel A. Mills
5
159.00
*128 The above amounts include the principal and, in some cases, interest on the investments. Conway Twitty became aware of possible violations of the securities laws by Twitty Burger in 1970. Several attorneys, the last of which was Cleta John Rogers, were hired by Twitty Burger to attempt to get the Twitty Burger capital stock registered. By October of that year, Mr. Rogers had determined that it was not possible to register the capital stock of Twitty Burger. After that time, no further attempts at fulfilling the requirements for registration were made and the application for registration was withdrawn from the Securities and Exchange Commission. [6] During late 1970, Twitty Burger began to encounter financial difficulties. Shortly after the time it was determined that the capital stock could not be registered, it was decided that Twitty Burger should be shut down. After Twitty Burger ceased operating its restaurants *129 in 1971, petitioner and those in his employ commenced a program of terminating the leases of the restaurant premises and paying the general creditors. The restaurants were in poor financial condition at this time. Thereafter, petitioner had no intention of reopening the Twitty Burger restaurants or attempting to sell the corporation. The last Twitty Burger restaurant was closed in May 1971, except for one franchise that had been sold to a group of doctors who, as of the date of trial, continue to operate a restaurant in Hemphill, Texas. Subsequently, Conway Twitty decided that the investors should be paid the amount of money that they had invested in Twitty Burger. Although petitioner had not participated in the day-to-day operation of Twitty Burger and had not reviewed many of the documents received by his lawyers and business associates regarding the investments in Twitty Burger and those documents received from the Securities and Exchange Commission, he did participate in the determination that Twitty Burger should be closed down. As Twitty Burger had no assets with which to pay the debentures, Conway Twitty decided that he would repay the investors from his future earnings. *130 After Twitty Burger ceased operations, Conway Twitty repaid the investors in Twitty Burger the amount of their investment and, in some instances, an additional amount representing interest thereon.During 1973 and 1974, he repaid the following investors by checks drawn on his personal accounts in the amounts listed: 1973
Name
Check Number
Amount
G. W. Shuck
1215
$ 252.49
Harlan Howard
1216
3,187.75
Don Davis
1217
3,187.95
Bob Neal
1329
3,156.19
Bob Neal
1330
1,191.02
Merle Haggard
1817
30.000.00
Steve Lake
1823
10,000.00
Tom Cole
1961
600.00
Les Chapman
1977
620.00
Les Chapman
1994
620.00
Robert & Lola Hurley
1998
1,500.00
Jimmy Loden, a/k/a
Sonny James
2055
10,000.00
Larry Mohr
2086
300.00
Frank Smart
2222
2,500.00
Robert F. Smart
2224
3,000.00
Scott Smart
2226
2,500.00
John Weatherford
2236
659.79
Earl T. Merrick
2326
2,500.00
Earl Merrick
2327
2,500.00
Catherine Merrick
2328
5,000.00
Fern Bennett
2411
2,500.00
Billy C. Trousdale
2512
2,110.63
Anthony Chiodi
2615
2,700.00
Harlan Core
2775
1,306.64
Dale Ferguson
1884
1,000.00
Total
$92,892.46
1974
Graham Kendall
2873
$ 1,000.00
Roger Cleghorn
2874
500.00
E. H. Wilemon
3065
2,000.00
M. L. Clifton
3209
100.00
Total
$ 3,600.00
*131 On his 1973 and 1974 Federal income tax returns petitioner deducted these total amounts, $92,892.46 and $3,600, respectively, as bad debts or alternatively, as ordinary and necessary business expenses under section 162. [7] In two separate notices of deficiency mailed to petitioners on December 19, 1978, respondent determined that these total amounts were not deductible under either theory but rather were nondeductible personal expenses. [8]
OPINION The sole issue presented for our decision is whether payments made by petitioner to investors in a failed corporation known as Twitty Burger, Inc., are deductible as ordinary and necessary business expenses of petitioner's business as a country music performer. The general rule is that a shareholder [9] may not *132 deduct a payment made on behalf of the corporation but rather must treat it as a capital expenditure. Deputy v. Dupont,308 U.S. 488 (1940); Gould v. Commissioner,64 T.C. 132, 134 (1975); Rand v. Commissioner,35 T.C. 956 (1961). However, the payment may be deducted if it is an ordinary and necessary expense of a trade or business of the shareholder. Lohrke v. Commissioner,48 T.C. 679 (1967). Section 162(a) provides in pertinent part: In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *. As is clear from the statutory language, to be deductible under section 162, a business expense must be both "ordinary" and "necessary." In Welch v. Helvering,290 U.S. 111 (1933), the Supreme Court discussed the meaning of those terms. The taxpayer in Welch was the secretary *133 of the E.L. Welch Company, a corporation engaged in the grain business which was eventually adjudged an involuntary bankrupt. Thereafter, the taxpayer became associated with another grain company. In order to reestablish his relations with former customers of the bankrupt company in developing his new business, Mr. Welch decided to pay the debts of the Welch Company himself. The Commissioner disallowed the claimed deduction of these amounts as business expenses on the basis that such payments were not ordinary and necessary expenses but were rather in the nature of capital expenditures allocable to his new business. The Supreme Court stated that while the payments to the corporation's creditors were "necessary" for the development of the petitioner's business, at least in the sense that they were appropriate and helpful, it remained to be decided whether such payments were "ordinary." In sustaining the Commissioner's disallowance of the deduction, Justice Cardozo speaking for the Court stated: Men do at times pay the debts of others without legal obligation or the lighter obligation imposed by the usages of trade or by neighborly amenities, but they do not do so ordinarily, *134 not even though the result might be to heighten their reputation for generosity and opulence. Indeed, if language is to be read in its natural and common meaning [citations omitted], we should have to say that payment in such circumstances, instead of being ordinary is in a high degree extraordinary. Welch v. Helvering,supra at 114. See also Deputy v. Dupont,308 U.S. 488 (1940). An exception to the general rule that one person [10] may not deduct the expenses of another person has been recognized in those cases where the expenditures sought to be deducted were made by a taxpayer to protect or promote his own ongoing business, even though the transaction originated with another person. Lohrke v. Commissioner,supra at 684-685; Pepper v. Commissioner,36 T.C. 886 (1961). In Lohrke, the taxpayer was allowed a deduction for a payment made on behalf of a corporation in which he had a substantial interest. The corporation had made a shipment *135 of defective fiber produced by a patented process owned by the taxpayer personally and from which he derived significant income. The petitioner believed that if he did not personally reimburse the customers' losses his personal business reputation would be harmed in that the corporation's involvement in the transaction might become known to the entire synthetic fiber industry. The petitioner's surname constituted a portion of the corporation's name and the taxpayer had never attempted to separate his activities as an inventor from his activitites as president of the corporation to any member of the industry. We noted in Lohrke,supra at 685, that in a number of cases the courts have allowed deductions for expenditures made by a taxpayer to protect or promote his own business even though the transaction originated with another person and that the resulting expenditures would have been deductible by that other person if payment had been made by him. After a fairly exhaustive review of many of the cases dealing with this issue [11] the Court stated as follows: The tests as established by all of these cases are that we must first ascertain the purpose or motive *136 which cause the taxpayer to pay the obligations of the other person. Once we have identified that motive, we must then judge whether it is an ordinary and necessary expense of the individual's trade or business; that is, is it an appropriate expenditure for the furtherance or promotion of that trade or business? If so, the expense is deductible by the individual paying it. Lohrke,supra, at 688. Rushing v. Commissioner,58 T.C. 996, 1003 (1972). *137 Applying this test to the facts in Lohrke, we found that the taxpayer was of the opinion that his failure to assume the corporate obligation would have adversely affected his licensing business because of the harm that would have resulted to his own reputation. Because we believed that the petitioner's primary motive was the protection of his personal licensing business and that the payment was proximately related to that business, the deduction was allowed as an ordinary and necessary business expense. Similarly in Gould v. Commissioner,64 T.C. 132 (1975), we allowed the taxpayer a deduction for payments made to debtors of his wholly-owned corporation because we found that the payments were made to preserve his employment at another corporation. We specifically found that petitioner did not make the payments to revitalize the corporation or to enhance the value of his investment. See Koree v. Commissioner,40 T.C. 961 (1963). The corporation was defunct and had ceased conducting any activities except those related to terminating its operations. We turn now to the case at bar. The question presented is whether one person (Conway Twitty) *138 may deduct the expenses of another person (Twitty Burger). In order to determine whether the disallowed expenditures are deductible by petitioner under section 162 we must (1) ascertain the purpose or motive of the taxpayer in making the payments and (2) determine whether there is a sufficient connection between the expenditures and the taxpayer's trade or business. Lohrke v. Commissioner,supra.Petitioner bears the burden of proving that respondent's determination was in error. Rule 142(a), Tax Court Rules of Practice and Procedure.
The relevant facts are as follows: Petitioner Conway Twitty is a well-known country music entertainer. Most of his income is derived from his performances, songwriting, and record royalties. In 1968, Conway and several of his friends decided to form a chain of fast food restaurants and incorporated Twitty Burger under the laws of Oklahoma. During 1968 and 1969, approximately 75 of petitioner's friends and business associates invested money in Twitty Burger. Subsequently it was determined that it would be some time before the requirements of the Security and Exchange Commission could be met and a public offering of stock made. *139 It was determined, therefore, that debentures should be issued to those persons who had invested money in the undertaking as interim evidence of their investments. By late 1970, Twitty Burger was experiencing financial difficulties and it was determined by Twitty Burger's attorney that further attempts to obtain registration of the corporate stock would be futile. Shortly thereafter it was decided that Twitty Burger should be shut down. Except for one independently-owned franchise operating in Texas, the last Twitty Burger restaurant was closed in May 1971. Subsequently, Conway Twitty decided that the investors should be repaid the amount of their investments in the failed corporation. As Twitty Burger had no assets with which to satisfy the debentures, Conway Twitty decided he would repay the investors from his future earnings. During the years in issue, 1973 and 1974, Conway Twitty made payments to the investors of $92,892.46 and $3,600, respectively. Respondent argues that the payments Conway Twitty made to the investors in Twitty Burger are not deductible by him as ordinary and necessary business expenses under section 162 because there was no business purpose for the *140 payments and, additionally, there was no relationship between his involvement in Twitty Burger and his business of being a country music entertainer. Respondent argues that the payments in question here were made by Conway Twitty gratuitously in that petitioner had no personal liability to the holders of the debentures and made the payments merely out of a sense of moral obligation. Relying on Welch v. Helvering,supra at 114, and certain of its progeny, respondent concludes that while it was "very nice" of petitioner to reimburse the investors in Twitty Burger, the required nexus between the expenditures and Conway Twitty's career as a country music entertainer does not exist and therefore the payments were not "ordinary and necessary" within the meaning of section 162. Petitioner argues that the rule of Welch v. Helvering,supra, is not applicable to the case at bar because petitioner made the payments in question to protect his reputation and earning capacity in his ongoing business of being a country music entertainer whereas in Welch the Supreme Court held that the Payments made there were capital expenditures of the taxpayer's *141 new business. Petitioner maintains that under the test as formulated by this Court in Lohrke, the expenditures in issue here are deductible under section 162 if the payments were made primarily with a business motive and if there is a sufficient connection between the payments and the taxpayer's trade or business. Lohrke v. Commissioner,supra at 688. The question presented for our resolution is purely one of fact. While previously decided cases dealing with this issue are somewhat helpful there is, quite understandably, no case directly on point with the facts before us. As the Supreme Court recognized in Welch v. Helvering,supra at 116, Many cases in the federal courts deal with phases of the problem presented in the case at bar. To attempt to harmonize them would be a futile task.They involve the appreciation of particular situations, at times with border-line conclusions. There is no suggestion in the record that any of the payments were made in order to protect petitioner's investment in Twitty Burger or to revitalize the corporation. See Gould v. Commissioner,supra.It is petitioner's contention *142 that Conway Twitty repaid the investors in Twitty Burger from his personal funds in order to protect his personal business reputation. While it is clear from the facts that Conway was under no legal obligation to make such payments, (at least in the sense that the corporate debentures were not personally guaranteed by him), the law is clear that the absence of such an obligation is not in itself a bar to the deduction of such expenditures under section 162. [12]Pepper v. Commissioner,supra at 895. In addition, the fact that the petitioner also felt a moral obligation to the people who had entrusted him with their funds does not preclude the deductibility of the payments so long as the satisfaction of the moral obligation was not the primary motivation for the expenditures. See Dunn & McCarthy, Inc. v. Commissioner,139 F.2d 242 (2d Cir. 1943); Pepper v. Commissioner,supra.
*143 After a thorough consideration of the record we are convinced that petitioner Conway Twitty repaid the investors in Twitty Burger with the primary motive of protecting his personal business repuation. There was the obvious similarity of the name of the corporation and petitioner's stage name. See Lohrke v. Commissioner,supra;L. Heller & Son, Inc. v. Commissioner,12 T.C. 1109 (1949). There is no doubt that the corporation's name was chosen with the idea of capitalizing on Conway Twitty's fame as a country music performer. Additionally, many of the investors were connected with the country music industry. [13] While there is no doubt that part of petitioner's motivation for making the payments involved his personal sense of morality, we do not believe that this ethical consideration was paramount. *144 Petitioner testifed as follows concerning his motivations for repaying the Twitty Burger investors: I'm 99 percent entertainer. That's just about all I know. The name Conway Twitty, and the image that I work so hard for since 1955 and '56 is the foundation that I, my family, and the 30 some odd people that work for me stand on. They depend on it, and they can depend on it. I handle things the way I did with Shell Oil Company, with Diner's Club, with Gulf Oil Company, with a lot of other things before that and after that other than Twitty Burger. I handled them all the same way for more than one reason. First of all, because of the way I perceive myself and my image. It may not be the same as this guy over here or that one over there, but to me if Conway Twitty does some little old something, it's different than somebody else doing something because everybody has got a different relationship with whoever their fans are. I handled it that way because of that. Because of the image. And second and very close to it, I handled it that way because I think it is morally right, and if you owe a man something, you pay him. If a man owes you something, he pays you. And if a *145 man is going to pay you a dollar for an hour's work, you work -- you know -- it sounds weird to hear myself saying those things. I know they are true. And it's the way I live, but for some reason in this day and time, I feel funny saying that. And I shouldn't because we grew up in a time when that was -- that was the way it was. And I would love to think that that's the way it still is. But when you look around you and you deal with other people, you know it's not true 100 percent of the time anymore, but it's true with Conway Twitty and no matter which way this turns out, I'd do the same thing again tomorrow, if I had to do over. * * * * * * When we got the letter from Walter Beach and from Haggard's lawyer and from a couple other places, and my people said, hey, you know, we've got some letters from people saying they are going to sue you, and that you might have done something wrong as far as securities and all that stuff goes. It just scares you to death. I mean it did me. And it would most people. I know it would. And so you -- you don't want any part of that. A law suit like that with -- say if Merle Haggard sued Conway Twitty or if Walter Beach sued Conway *146 Twitty and you're in court, and they are saying it's fraud and something to do with the securities thing, and, you know, all the years I've worked for are gone. If my fans didn't give up on me, it would warp me psychologically. I couldn't function anymore because I'm the type of person I am. I remember it. * * * * * * I thought the country music entertainer is just as important or maybe even a little more important than a rock performer because of the longevity and because -- and the reason you have that longevity is because of the fan. The country music fan is different than the people I had dealt with back in the '50's and the kids. They will stay right with you as long as you stay within a certain boundaries. They expect a lot out of you because you -- a country singer deals with -- they deal with feelings and things inside of people -- you know -- you can listen to the words in a country song, and you're dealing with emotions and feelings that -- it's kind of like a doctor, you know. I'm not comparing myself with a doctor certainly, but when a person gets to trust a doctor, that's all they need is that trust. Petitioner presented the expert testimony of William *147 Ivey, the Director of Country Music Foundation in Nashville, Tennessee. In his report which was introduced into evidence in lieu of direct testimony he stated as follows: Country music is the direct, commercial descendent of the folk music carried to the Appalachian mountains by some of the early settlers of the United States. Though modern country music has developed may new characteristics which separate it from its folk roots, several important elements remain from the folk past. The emphasis on story songs, the use of many stringed instruments in performance, and the close identification of the personality of the performer with the material that is performed are all aspects of folk music which remain a part of modern country music. In the folk communities of the rural South, folk music performers were not viewed as professional entertainers, but were rather seen as friends and neighbors who happened to entertain. Thus the status of a folk musician was based not only upon performing skills but also upon those other traits of personality and character which placed a person in a good or bad light within his community. This tendency to link a performer's non-performing image *148 with his artistry exists to some degree in all of art, but it is most noticeable and important in those musical styles which have emerged from folk roots. Country music is one of those folk-based forms. Country entertainers go to great lengths to protect their images, for they correctly realize that both business associates and fans judge their artistic efforts in the light of perceptions of the artist's personality, professional conduct, and moral character. The business side of country music is a highly personal activity which depends heavily upon knowledge of reputation and past performance. Throughout the process of recording, touring, and composing, businesses must be established, credit extended, and payments made. The reputation of an entertainer among business associates and within the financial community can have a determinative role in that artist's ability to conduct his affairs. Reputation can have an even greater effect upon an entertainer as it influences fans. Virtually every article written about Conway Twitty stresses the effort he makes to meet his fans. John Pugh, writing in Country Music Magazine, says "Perhaps there has never been a harder working *149 artist than Conway Twitty…. Or an artist who cared more for his fans." Devotion to fans is a crucial part of Conway's great success, and his scrupulously maintained reputation is one element in maintaining his intense popularity. * * * * * * Stories abound of the problems encountered by artists who have not followed Conway's example. George Jones, Waylon Jennings, and Johnny Paycheck are all great entertainers, but each has been plagued by personal problems which have limited the extent of their success. Had, in the matter before this court, Conway Twitty allowed investors to be left dangling with heavy losses following the collapse of the Twitty Burger chain, the multiple lawsuits, unfavorable news stories and disgruntled investors would have all damaged that very reputation which was a key element in Conway's image as an artist. Though he would have continued to perform and record, there exists serious doubt that he would have achieved the unparalleled success he enjoyed during the 1970's had his reputation been so injured. In fact, his performance in the Twitty Burger matter became another ingredient in Conway's positive image. Tom Carter, writing in the Tulsa, Oklahoma, *150 DailyWorld:
"Twitty's 'character' seems a bit out of character in the entertainment world. That point was proved a few years ago when Twitty formed a restaurant chain selling 'Twitty Burgers.' "He persuaded friends to invest $1 million. They lost it all. Twitty was determined to pay them back, rather than merely declare bankruptcy on the corporation." As a scholar of country music and an observer of the country music scene, I am convinced that a country entertainer's character, personality, and credit reputation are part and parcel of his role as a singer. This integration of art and the individual existed in the folk communities from which country music grew, and it remains an aspect of country music today. Had Conway Twitty not maintained a flawless financial and personal reputation, he would not have become the most-successful male vocalist within the art form. Had he allowed investors to suffer as a result of Twitty Burger's failure, both his reputation and his career would thus have been damaged. We conclude that there was a proximate relationship between the payments made to the holders of Twitty Burger debentures and petitioner's trade or business as *151 a country music entertainer so as to render those payments an ordinary and necessary expense of that business. Although, as respondent argues, the chances of a successful lawsuit against Conway Twitty by any of the investors or the Securities and Exchange Commission was remote we agree with petitioner that the possibility of extensive adverse publicity concerning petitioner's involvement with the defunct corporation and the consequent loss of the investors' funds was very real. We do not believe it is necessary for us to find that adverse publicity emanating from Conway Twitty's failure to repay the investors in Twitty Burger would have ruined his career as a country music singer. Rather, we need only find that a proximate relationship existed between the payments and petitioner's business. We find that such relationship exists. It is not necessary that the taxpayer's trade or business be of the same type as that engaged in by the person on whose behalf the payments are made. See for example Scruggs-Vandervoort-Barney, Inc. v. Commissioner,7 T.C. 779 (1946), where petitioner operated a retail department store and was allowed a deduction for payments made to *152 creditors of a failed bank which had been owned by petitioner's predecessor. In making these payments petitioner was furthering his business as a country music artist and protecting his business reputation for integrity. The mere fact that they were voluntary does not deprive them of their character as ordinary and necessary business expenses. Milbank v. Commissioner,51 T.C. 805, 808 (1969); Lohrke v. Commissioner,supra.Under the unique circumstances presented in this case, we hold that the payments in issue are deductible as business expenses under section 162. [14]
*153 Decision will be entered under Rule 155.
Footnotes
1. With respect to the year 1973, the petitioners concede that the adjustments set forth in the notice of deficiency identified as adjustments (b) through (g) in the respective amounts of $17,970, $3,173, $482, $384, $959, and $2,897, are correct. The petitioners also concede that the portion of the claimed bad debt relating to payments totaling $14,899.10 which were made on debts personally quaranteed by petitioner during the time Twitty Burger, Inc., was a viable, economic, operating business is not allowable as business bad debts, but rather, is allowable as nonbusiness bad debts. Finally, with respect to the year 1973, the petitioners concede that $313.10 of that portion of the claimed business bad debt in the amount of $626.20 relating to payments to general creditors of Twitty Burger, Inc., is not deductible as a business bad debt, but instead is deductible as a nonbusiness bad debt. Respondent concedes that the remaining $313.10 is deductible as an ordinary and necessary business expense. With respect to the year 1974, the petitioners agree that the adjustments to income set forth in the notice of deficiency as adjustments (b) through (h) in the respective amounts of $21,570, $3,809, $578, $400, $1,151, minus (-) $643 and $5,173, are correct. The petitioners also concede that $5 of that portion of the claimed business bad debt in the amount of $10 relating to payments to general creditors of Twitty Burger, Inc., is not deductible as a business bad debt, but instead is deductible as a nonbusiness bad debt. Respondent concedes that the remaining $5 is deductible as an ordinary and necessary business expense.↩
2. Inasmuch as Temple M. Jenkins is a party to this proceeding solely by reason of her having filed a joint return with her husband for the taxable year 1974, all references hereinafter to the petitioner shall refer to the petitioner-husband.↩
3. The "Number 1" designation refers to the position of a recording on a music-industry trade publication chart.↩
4. One criteria for a record to became a Number 1 hit is that it must have minimum sales of approximately 150,000 units. Conway Twitty has had more Number 1 hit songs on the country music charts than any other performer.↩
5. Petitioner's Twitty Bird logo appeared on the restaurant menus along with a picture and a message from Conway Twitty concerning his music career and the inspiration for the Twitty Burger restaurants.↩
6. Twitty Burger never had a valid prospectus in force nor was it ever qualified to publicly distribute securities. The Securities and Exchange Commission accepted the withdrawal as an assurance that the corporation would refrain from distributing securities.↩
7. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue. ↩
8. Petitioners concede that the amounts in controversy do not represent deductible bad debt expenses as claimed in the returns and the petition. The parties agree that the only issue in the case is whether the amounts in controversy represent deductible business expenses under section 162.↩
9. Although petitioner was not technically a "shareholder" of Twitty Burger in that no stock was ever issued, it is clear from the record that Conway Twitty had a substantial equity interest in the corporation.↩
10. We use the term "person" as meaning and including an individual, trust, estate, partnership, association, company, or corporation. Section 7701(a)(1).↩
11. See Lutz v. Commissioner,282 F.2d 614 (5th Cir. 1960), revg. and remanding a Memorandum Opinion of this Court; Pepper v. Commissioner,36 T.C. 886 (1961); Snow v. Commissioner,31 T.C. 585 (1958); Dinardo v. Commissioner,22 T.C. 430 (1954); Crowder v. Commissioner,19 T.C. 329 (1952); L. Heller & Son, Inc. v. Commissioner,12 T.C. 1109 (1949); Catholic News Publishing Co. v. Commissioner,10 T.C. 73 (1948); Scruggs-Vandervoort-Barney, Inc. v. Commissioner,7 T.C. 779 (1946). For cases denying a deduction on this issue, see Dodd v. Commissioner,298 F.2d 570 (4th Cir. 1962), affg. a Memorandum Opinion of this Court; Koree v. Commissioner,40 T.C. 961 (1963); Howard v. Commissioner,39 T.C. 833 (1963); Mensik v. Commissioner,37 T.C. 703 (1962), affd. 328 F.2d 147↩ (7th Cir. 1964).
12. We note that several demands for payment from individual investors or their attorneys appear in the record and as late as March of 1972 the Securities and Exchange Commission was suggesting that possible violations of the Federal securities laws may have been committed by Twitty Burger.↩
13. For example, Harlan Howard, Don Davis, Merle Haggard, Steve Lake, and Jimmy Loden, a/k/a/ Sonny James. Petitioner's counsel aptly remarked in his opening statement: "Imagine trying to keep a band together where somebody has stiffed the drummer's mother." We note, however, that "Pork Chop's" mother, Lucibelle Markham, was repaid in a year not at issue in this case.↩
14. We close with the following "Ode to Conway Twitty": Twitty Burger went belly up But Conway remained true He repaid his investors, one and all It was the moral thing to do. His fans would not have liked it It could have hurt his fame Had any investors sued him Like Merle Haggard or Sonny James. When it was time to file taxes Conway thought what he would do Was deduct those payments as a business expense Under section one-sixty-two. In order to allow these deductions Goes the argument of the Commissioner The payments must be ordinary and necessary To a business of the petitioner. Had Conway not repaid the investors His career would have been under cloud, Under the unique facts of this case Held:↩ The deductions are allowed.